**YANKTON SCHOOL DISTRICT,**
Plaintiff/Appellant,

v.

**Harold and Angie SCHRAMM,**
Defendants/Appellees.

No. Civ 94–4240.

United States District Court,
D. South Dakota,
Southern Division.

Sept. 7, 1995.

---

Gerald L. Kaufman, Churchill, Manolis, Freeman, Kludt & Kaufman, Huron, SD, Richard D. Hagerty, Yankton, SD, for plaintiff.

John A. Hamilton, South Dakota Advocacy Services, Pierre, SD, for defendants.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

Yankton School District brings this civil action challenging the state hearing examiner's decision that high school student Tracy Schramm is eligible for special education, related services, and transition services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* The Court has jurisdiction of this suit under 20 U.S.C. § 1415(e). For the reasons discussed below, the Court enters judgment in favor of the Schramms, thereby upholding the state hearing officer's decision.

### I. Statutory Overview and Standard of Review

The IDEA requires states to provide disabled children with a "free appropriate public education." 20 U.S.C. § 1401(a)(18). A "free appropriate public education" means special education and related services that are provided at public expense, under public supervision and direction, and without charge; that meet the standards of the State educational agency; that include an appropriate preschool, elementary, or secondary school education in the State involved; and are provided in conformity with the individu-

alized education program required under 20 U.S.C. § 1414(a)(5). 20 U.S.C. § 1401(a)(18); 34 C.F.R. § 300.8 (1994); *Board of Educ. of the Hendrick Hudson Central School Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). Congress has defined "special education" as:

*specially designed instruction,* at no cost to parents or guardians, to meet the unique needs of a child with a disability, including—

(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and

(B) instruction in physical education.

20 U.S.C. § 1401(a)(16) (emphasis added). Note 1 to 34 C.F.R. § 300.17 (1994), states that "[t]he definition of special education is a particularly important one under these regulations, since a child does not have a disability under this part unless he or she needs special education." "Related services" are statutorily defined to mean:

transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(a)(17); 34 C.F.R. § 300.16 (1994). Note 1 to § 300.17 states that "[t]he definition of related services (§ 300.16) also depends on [the definition of special education], since a related service must be necessary for a child to benefit from special education. Therefore, if a child does not need special education, there can be no related services, and the child is not a child with a disability and is therefore not covered under the Act."

In the 1990 amendments to the IDEA, Congress clarified what it meant by "transi-

tion services" by providing the following definition:

> a coordinated set of activities for a student, designed within an outcome-oriented process, which promotes movement from school to post-school activities, including post-secondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation. The coordinated set of activities shall be based upon the individual student's needs, taking into account the student's preferences and interests, and shall include instruction, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401(a)(19); H.R.Rep. No. 544, 101st Cong., 2nd Sess., at 9–10 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1723, 1732–1733. The disabled child's individualized education program (IEP) is prepared at a meeting attended by a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child. 20 U.S.C. § 1401(a)(20). The IEP must include (1) a statement of the child's present levels of educational performance; (2) a statement of annual goals, including short-term instructional objectives; (3) a statement of the specific educational services to be provided to the child and the extent to which the child will be able to participate in regular educational programs; (4) a statement of needed transition services for the child beginning no later than age 16 (and in some cases at a younger age) and annually thereafter including a statement of the interagency responsibilities or linkages (or both) before the child leaves the school setting; (5) the projected date for initiation and anticipated duration of such services; and (6) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved. 20 U.S.C. § 1401(a)(20).

The IDEA also sets out extensive procedural safeguards that states receiving federal funds under its provisions must follow. 20 U.S.C. § 1415. Of particular importance are the Act's requirements that parents or guardians of a disabled child be notified of any proposed change in the child's IEP and that the parents be permitted to raise a complaint about any matter concerning the child's evaluation and education. 20 U.S.C. § 1415(b)(1)(C) & (E). Parents are entitled to seek an impartial due process hearing conducted by the State educational agency, 20 U.S.C. § 1415(b)(2), and any party aggrieved by the hearing officer's decision may pursue a civil action in state court or federal district court for review of that decision. 20 U.S.C. § 1415(e)(2).

On review, this Court "shall hear additional evidence at the request of a party," 20 U.S.C. § 1415(e)(2), but the Court "must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo.*" *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 791 (1st Cir.1984), *aff'd* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). In this case, the Court received the entire administrative record and limited additional evidence presented at a hearing on August 21, 1995. The Court must base its decision "on the preponderance of the evidence," and grant such relief as the Court deems appropriate. 20 U.S.C. § 1415(e)(2). The burden of proof rests with Yankton School District as the party challenging the administrative determination. *See Hiller v. Board of Educ. of Brunswick Central School Dist.*, 743 F.Supp. 958, 967 (N.D.N.Y.1990). The provision that the Court rest its decision on a preponderance of the evidence "is by no means an invitation to [this Court] to substitute [its] own notions of sound educational policy for those of the school authorities which [the Court] review[s]." *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. "The fact that § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to [those] proceedings." *Id.; Petersen v. Hastings Public Schools*, 31 F.3d 705, 707 (8th Cir. 1994) (holding that federal court's review of the state administrative decision "is, in reali-

ty, quite narrow.") The Court's inquiry in suits brought under § 1415(e)(2) is twofold:

First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051.

## II. Facts of This Case

Tracy Schramm is seventeen years old and a junior at Yankton High School in the 1995–96 school year. Due to cerebral palsy, Tracy has had from birth a number of physical disabilities. As a result, starting in third grade she was classified as orthopedically impaired. Tracy does not have intellectual, learning, or psychological disabilities. She is an excellent student with a high grade point average who is enrolled in the regular college preparatory curriculum at the high school. In the future she hopes to attain a college degree, and perhaps a graduate degree, in computer engineering. Tracy participates in extracurricular and community activities.

Because of her physical disabilities, Tracy uses a walker for short distances and a wheelchair for longer distances. She walks and writes slowly. Tracy cannot function independently, as she needs assistance in personal grooming and in putting on her shoes, and she has not learned such household skills as pouring beverages, cooking, and cleaning. She has learned to use both hands to play the saxophone in the school band, but she has trouble with some speeds in playing the instrument. The record does not contain the written IEPs for Tracy's elementary school years, but the parties do not dispute that, for the last several years, the written IEPs covered only adaptive physical education, physical therapy, and transportation.

On March 31, 1994, two weeks prior to Tracy's sixteenth birthday, the District convened an IEP meeting to discuss providing Tracy with transition services under IDEA. At that meeting, the District provided limited information to Tracy and her parent, Angie Schramm, and, at the conclusion of the meeting, all of the participants, including the Schramms, signed a transition plan which placed nearly all responsibility for transition planning on the Schramm family. In May 1994, the District sent Tracy to the Prairie Freedom Center for Independent Living, located in Sioux Falls, South Dakota, for a driver's evaluation. The evaluator concluded that Tracy lacked strength to turn a steering wheel and recommended that she participate in a van assessment at the Courage Center in Golden Valley, Minnesota, to determine if appropriate adaptive equipment could help Tracy learn to drive. The District did not follow up on this recommendation.

Upon completion of adaptive physical education at the close of the ninth grade in June 1994, Tracy satisfied all physical education requirements of the Yankton School District, as the District does not offer physical education beyond the ninth grade (the State of South Dakota requires physical education through eighth grade). At a June 1994 IEP meeting, the District officially informed Tracy and her parents that the District no longer considered Tracy qualified for special education under the IDEA and consequently, Tracy did not qualify for related services or transition services. The District dismissed her from the special education program.

Tracy's parents, Harold and Angie Schramm, requested an impartial due process hearing to contest the District's decision, as they wanted Tracy to receive transition services to ease the passage from high school to independent living away from home, especially considering Tracy's desire to attend college. State hearing examiner John R. Steele conducted the hearing on August 22, 1994, and issued his Decision and Findings of Fact and Conclusions of Law in favor of the Schramms in September 1994.

The District does not dispute the state hearing examiner's finding that the District provided Tracy, prior to her June 1994 dismissal from special education, with services that were not specifically included in the

written IEP.[1] These services include assistance moving between classes, getting on and off the school bus, going up and down stairs in the school building, carrying a lunch tray, and setting up the saxophone for band; provision of four different sets of text books (three at various sites in the school building and one at home) so that Tracy does not have to carry books; modification of the length and type of certain written classroom assignments in response to Tracy's slowness and fatigue in writing out assignments; and provision of one-handed typing instruction in computer class because of the significantly greater degree of impairment in Tracy's right hand.[2]

The state hearing examiner held that Tracy qualifies for special education because the District does provide her with specially designed instruction and related services, even though such instruction and services have not been included in the written IEP, and such continued instructional modifications and services are necessary for Tracy to benefit from the regular education curriculum. The hearing examiner held that the District should have included on the annual written IEP all of the instructional modifications and services that it provides to Tracy.

The hearing examiner next held that, even if Tracy is not eligible for special education, transition services under the IDEA can stand alone as a special education program. The examiner stated that his conclusion "follows from a plain reading of the regulations, supplemented by the official notes." (Decision at 5.) The note to 34 C.F.R. § 300.18 (1994), reads in pertinent part:

> Transition services for students with disabilities may be special education, if they are provided as specially designed instruction, or related services, if they are required to assist a student with a disability to benefit from special education.

The hearing examiner found that the transition services Tracy and her parents request-ed would include instruction in a variety of independent living skills and self-advocacy, and thus, the District could and should provide those services to Tracy as a special education program. He found that the transition plan written in March 1994 did not comply with the statutes and regulations because the plan manifested an overly narrow view of the District's responsibility to evaluate Tracy and to coordinate transition services for her with other agencies. The hearing examiner found that Angie Schramm's acceptance of the transition plan by signing it the day it was presented has no effect because Mrs. Schramm was not aware at that time of the extent of transition services the law requires the District to provide and the school was her primary source of such information. The hearing examiner found that the District acted in good faith in trying to establish a transition plan for Tracy, but the District's misinterpretation of its own responsibilities under the law resulted in a plan that is not in compliance with the statutes and regulations. Finally, the hearing examiner concluded that he lacked authority to award attorney's fees to the Schramms, although he was inclined to do so.

In this action seeking review of the administrative decision, the District renews its contention that Tracy is not eligible for special education. The District argues that Tracy does not have "a severe orthopedic impairment that *adversely affects [her] educational performance.*" 34 C.F.R. § 300.7(b)(7) (1994) (emphasis added). The District emphasizes Tracy's excellent grades and her overall success in school as evidence that her educational performance is not adversely affected by her physical disability. Citing *Rowley,* the District asserts that it is not required to maximize Tracy's educational potential, but must only provide her with a "basic floor of opportunity." Because Tracy's orthopedic impairment does not affect her educational performance, the District

---

**1.** The District takes the position, however, that such services were provided to Tracy as accommodations under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and not as special education or related services under the IDEA.

**2.** In addition to the services just mentioned, the District's Section 504 plan for Tracy's 1995–96 school year includes physical therapy, which was formerly provided to Tracy as a related service under IDEA, and a modified lab station for chemistry class. (Aug. 21, 1995 Evidentiary Hr'g Def. Ex. A.)

contends that Tracy does not "need special education and related services" and therefore, she does not meet the IDEA definition of a child with a disability who is covered by the Act. 20 U.S.C. § 1401(a)(1)(A); 34 C.F.R. § 300.7(a)(1) (1994). The District reiterates its view that the services it provides to Tracy are properly characterized as accommodations under Section 504 of the Rehabilitation Act and not as special education or related services under IDEA. The Schramms urge the Court to adopt the reasoning of the state hearing examiner, arguing particularly that Section 504 of the Rehabilitation Act is immaterial to this case.

The Court permitted the District to present additional limited testimony as to the interrelationship of IDEA and the Rehabilitation Act and allowed the parties to present evidence of events occurring during Tracy's sophomore year in 1994–95, as that evidence supplements the evidence that was before the state hearing officer in August 1994 relating solely to Tracy's freshman year in 1993–94. Tracy testified at the evidentiary hearing that in keyboarding class last year she learned to type with her left hand and the first finger of her right hand. She was the only student in her class to learn this modified typing technique. Her final grade in the class was "A−" although the portion of the grade attributed to typing speed was "C+" because Tracy could type only 25 words per minute, which is lower than the student average of 30 to 40 words per minute. The District provided Tracy with a computer in keyboarding and rhetoric classes, and the teacher shortened Tracy's written assignments in rhetoric class. In world history and biology classes, Tracy obtained photocopies of the teacher's class notes because she writes too slowly to take adequate notes. When possible Tracy tries to type her homework assignments on a desktop computer owned by her parents. Because of her disability, Tracy must devote four to five hours to homework every evening Sunday through Thursday during the school year.

The evidence reflects that the District applied the IDEA's "stay put" provision pending the outcome of the due process hearing and this civil action. *See* 20 U.S.C. § 1415(e)(3). Thus, Tracy has continued to receive transportation services and physical therapy under her last written IEP dated May 10, 1993. (Admin.Rec.School Ex. 3.) The Schramms agreed with the District that Tracy should not be required to repeat the adaptive physical education class that she completed her freshman year. There is no indication in the record that Tracy has received any transition services pending the outcome of this litigation.

## III. Analysis

*Eligibility for Special Education*

■ There does not appear to be a dispute as to whether the District complied with the procedures set forth in the IDEA. *See Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. At the administrative hearing, the Schramms stipulated that the District provided them with a written explanation of their procedural rights under the IDEA. (Admin.Tr. at 28–29, Admin.Rec.School Ex. 1.) Additionally, the record reflects that the District provided notice to Tracy and her parents on March 17, 1994, that the District intended to convene an IEP meeting on March 31, 1994, for the purpose of developing a transition plan for Tracy prior to her sixteenth birthday. (Admin.Rec.School Ex. 7.) Likewise, the District gave notice to Tracy and her parents on May 27, 1994, that it intended to convene an IEP meeting on June 2, 1994, to officially dismiss Tracy from the special education program. (Admin.Rec.School Ex. 14.) Following the June 2, 1994 IEP meeting, the Schramms exercised their statutory right to an impartial due process hearing. *See* 20 U.S.C. § 1415(b)(2). Therefore, the Court determines that IDEA procedural requirements have been met. 20 U.S.C. § 1415(b)(1)(C). The Schramms argue, however, that the District failed to provide them with correct information about the nature and scope of transition services. The Court considers this to be a substantive, rather than a procedural, matter, and the Court will consider the issue later in this opinion in conjunction with a discussion of Tracy's transition plan.

■ When procedural requirements are met, *Rowley* requires the Court to consider next whether the IEP developed through the Act's procedures is reasonably calculated to enable the· child to receive educational benefits. *See Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. In this case the District did not prepare a new IEP for Tracy for the 1994–95 school year because the District determined that Tracy had satisfied her need for special education by completing adaptive physical education as set out in the last written IEP dated May 10, 1993. Consequently, this Court must decide, giving due weight to the state administrative proceeding, whether the District properly applied the IDEA and its accompanying regulations when it dismissed Tracy from special education.

■ Having carefully considered the administrative record and the supplementary evidence presented, the Court finds by a preponderance of the evidence that Tracy remains eligible for special education, as the state hearing examiner found. Congress defines a "child with a disability" as one who has an orthopedic impairment and who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(a)(1)(A); Letter to Veir, 20 IDELR 864, 867. Congress defines "special education" as "specially designed instruction, ... including—instruction conducted in the classroom[.]" 20 U.S.C. § 1401(a)(16). No explanation is given in the IDEA statutes or regulations as to what the phrase "specially designed instruction" means. The United States Department of Education, Office of Special Education Programs, defines "specially designed instruction" as "education planned for a particular individual or 'individualized instruction.'" Letter to Smith, 19 IDELR 494, 495 (1992).[3] ·

■ The Court determines, based upon a preponderance of the evidence and giving due weight to the hearing examiner's decision, that Tracy has a severe orthopedic impairment and that, by reason of that impairment, she needs special education, that is, individualized instruction planned especially for her. Because an appropriate education for a physically disabled child with a normal intellectual capacity aims at promoting achievement roughly equivalent to that of her non-disabled peers, special education for such a child should entail classroom instruction where the nature of the physical disability is not so severe as to preclude her from the regular classroom environment. *Tokarcik v. Forest Hills School Dist.*, 665 F.2d 443, 455 (3d Cir.1981), *cert. denied*, 458 U.S. 1121, 102 S.Ct. 3508, 73 L.Ed.2d 1383 (1982). The District rightfully educates Tracy in the regular classroom environment. And, as the state hearing examiner found, the District specially designs some of the instruction that it provides to Tracy. Teachers shorten or modify homework and writing assignments for Tracy because of her writing slowness and fatigue, and during the last school year a teacher instructed Tracy in a modified keyboarding technique to compensate for the physical impairment in Tracy's hands and fingers. The Court finds that such modifications constitute specially designed instruction under the circumstances presented, although such modifications could also be provided to Tracy as accommodations under Section 504 of the Rehabilitation Act. *See* Letter to Honorable Wayne Teague, 20 IDELR 1462, 1463 (1994). Despite the District's position that Tracy needed only adaptive physical education as special education, all of the specially designed instruction and related services provided to Tracy to facilitate her placement in the regular classroom, including mobility assistance and extra sets of books, should have been included in her IEP. *See* 34 C.F.R. Part 300, question 48 (1994); 20 IDELR 541 (1993) (supplementary aids and services, such as large print books for visually impaired student, should be included on IEP as modifications needed to facilitate placement of disabled child in regular educational program).

---

**3.** Although the agency's interpretation of statutes and regulations set forth in Office of Special Education (OSEP) policy letters are not binding on recipients of IDEA funds, courts give substantial deference to an agency's interpretation of the statutes and regulations it must administer. *See Board of Regents of University of Minnesota v. Shalala*, 53 F.3d 940, 943 (8th Cir.1995); Letter to Honorable Major R. Owens, 22 IDELR 642 (1995).

The District argues that Tracy is not eligible for special education because her orthopedic impairment does not "adversely affect her educational performance." This quoted phrase does not appear in the statutes written by Congress, but surfaces in an agency regulation promulgated under the authority of the IDEA. 34 C.F.R. § 300.7(b)(7) (1994). The Office of Special Education Programs within the United States Department of Education recognizes that the phrase is contained within a regulatory, and not a statutory, definition. *See* Letter to Honorable Wayne Teague, 20 IDELR 1462–63 (1994). Moreover, the agency does not appear to construe this regulatory definition in a manner that narrows eligibility for special education, as the District urges this Court to do. Rather, relying on Note 1 to the regulatory definition of special education, 34 C.F.R. § 300.17, the agency emphasizes that a child does not have a disability unless she needs special education. *See* 20 IDELR at 1463. Thus, the agency's interpretation precisely mirrors the applicable statutory language crafted by Congress. The Court earlier found that Tracy needs special education by reason of her orthopedic impairment. *See* 20 U.S.C. § 1401(a)(1)(A). Therefore, the Court does not read 34 C.F.R. § 300.7(b)(7) to narrow or limit Tracy's eligibility for special education. Even if the regulatory definition does narrow eligibility for special education by requiring that an orthopedic impairment adversely affect a child's educational performance, the Court has no trouble finding by a preponderance of the evidence in this record that Tracy's orthopedic impairment adversely affects her educational performance and that she requires instructional modifications and related services to ensure that classroom instruction is available to her.

■ In holding that Tracy is eligible for special education under the IDEA, the Court rejects the District's argument that Tracy is entitled to accommodations solely under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Under Section 504, a disabled individual is one who has a physical or mental impairment that substantially limits one or more major life activities. 34 C.F.R. § 104.3(j) (1994); Letter to Teague, 20 IDELR at 1463. A recipient of federal funds that operates a public secondary school, like the District, is required to provide a free appropriate public education to each qualified individual with a disability in that jurisdiction, regardless of the nature or severity of the person's disability. 34 C.F.R. § 104.33(a); 20 IDELR at 1463. While some children may not be eligible for special education under the IDEA but yet qualify for Section 504 accommodations, 20 IDELR at 1463, the Court finds by a preponderance of the evidence that Tracy qualifies for a free appropriate education under both IDEA and the Rehabilitation Act.

Consequently, the Court will require the District to convene an IEP meeting for the formulation of appropriate special education, related services, and transition services for Tracy in compliance with the applicable IDEA statutes and regulations and in accordance with this opinion. The Court emphasizes that the last written IEP, dated May 10, 1993, was inadequately written because it failed to include all of the supplementary aids and services that are provided to Tracy so that she can be educated in the regular classroom. The District should include all such services on the written IEP that will be prepared for Tracy for the current 1995–96 school year and at least annually thereafter. *See Letter to Dr. Hal Hayden,* 22 IDELR 501 (October 3, 1994). In light of the Court's holding that Tracy is eligible for special education, related services, and transition services, the Court does not reach the issue of whether transition services may stand alone as special education or related services where a child is otherwise ineligible for special education.

*Transition Services*

■ The Court must next consider whether the transition plan the District drafted for Tracy on March 31, 1994, is reasonably calculated to enable Tracy to receive educational benefits. *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051. The Court finds that the transition plan fails to comply with IDEA statutes and regulations and with United States Department of Education policy statements. The transition plan must be reformulated.

Transition services are "aimed at preparing students (soon to leave school) for employment, *postsecondary education,* vocational training, continuing and adult education, adult services, *independent living,* or community participation." H.R.Rep. No. 544, 101st Cong., 2nd Sess., at 9–10 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1723, 1732–1733 (emphasis added). Toward this end, Congress expects *schools* to develop "a coordinated set of activities for each student, based upon the student's needs and taking into account the student's preferences and interests." *Id.* at 1732–33 (emphasis added). The *schools* are required to "(a) consider the post-school outcomes desired for that student, and (b) provide educational and related services designed to prepare the student for achieving these outcomes." *Id.* (emphasis added). Congress took special care in drafting the statutory definition of transition services to include a requirement that the coordinated set of activities for a student must "promote[ ] movement from school to post-school activities," because Congress "expects schools to familiarize themselves with the post-school opportunities and services available for students with disabilities in their communities and State, and make use of this information in the transition planning for individual students." *Id.* at 1733. Congress has squarely placed the "responsibility for developing and implementing interagency participation" on the administration of the school district, not upon the "already heavily-burdened teacher[,]" and Congress intends that other participating agencies will share responsibility with the schools for providing and funding a student's transition services. *Id.* at 1733–34.

The District contends that it fulfills its responsibility to develop and implement interagency participation in transition services if it communicates to the disabled student and her parents the kinds of agencies in the community that may be able to help the student in the future and provides the student and her family with a "linkage" to those agencies. At the transition planning meeting held for Tracy in March 1994, only representatives of South Dakota Rehabilitation Services and the federal Social Security Office attended the meeting, in addition to the reg-

ular IEP meeting participants. (Admin.Rec.School Ex. 11.) The transition plan drafted at that meeting states that vocational rehabilitation services, Supplemental Security Income, and "other programs available" were explained and that Tracy will need "Public and Private Transportation with assistive devices when appropriate." The District wrote that, "If Tracy is eligible for SSI she will also be eligible for Medicaid," and that "Prairie Freedom Center will be contacted by Angie Schramm." In the block for "Advocacy & Legal Services," the District wrote, "Not Applicable." In the remaining areas of "Personal Management & Family Relationship," "Financial & Income," "Living Arrangements," "Leisure & Recreation," and "Medical Services and Resources," the District provided no other transition planning. Tracy and her parents were assigned follow-up responsibility in every area, with the exceptions that LaRae Clark (whose position is not identified) was named as additionally responsible for "Post–Secondary Education & Vocational" and Pat Steckleberg was named as additionally responsible regarding finances and medical services. *Id.*

■■■ The Court finds that such a minimal approach to school district responsibility for transition services planning and implementation fails to comport with the expectation of Congress as set out in the legislative history to the IDEA. The District's position also falls short when it is scrutinized in light of state regulations and the direction and technical assistance provided to the District by the South Dakota Department of Education and Cultural Affairs. *See* A.R.S.D. 24:05:27:13.01–13.02 (1993); *From School to Adulthood: Special Education Students in Transition,* State of South Dakota Department of Education and Cultural Affairs (July 1994). "The IEP for each student, beginning no later than age 16 (and at a younger age, if determined appropriate), must include a statement of the needed transition services as defined in § 300.18, including, if appropriate, a statement of each public agency's and each participating agency's responsibilities or linkages, or both, before the student leaves the school setting." 34 C.F.R. § 300.346(b) (1994); Letter to Honorable Doug Bereuter,

20 IDELR 536, 538 (May 17, 1993). Transition services must cover the three areas specified at 34 C.F.R. § 300.18(b)(2)—instruction, community experiences, and the development of employment and other post-school adult living objectives—as well as the acquisition of daily living skills and functional vocational evaluation under § 300.346(b)(1). 20 IDELR at 538–39. If the IEP team determines with justification that services in one or more areas are not needed, the team must include a statement to that effect and the basis upon which the determination was made. 34 C.F.R. § 300.346(b)(2) (1994); Letter to Cernosia, 19 IDELR 933 (March 31, 1993). If a participating agency fails to carry out its responsibility, the school district must step forward and reconvene an IEP meeting to reach an alternative method of providing the necessary instruction or service. 34 C.F.R. § 300.347 (1994); 21 IDELR 673, 674 (1993).

The District's "Transition Plan" for Tracy does not satisfy any of the statutory or regulatory mandates, and the District's failure to understand its own responsibilities obviously contributed to the District's failure to inform the Schramms adequately of the nature and scope of transition services available to Tracy. The administrative record and the supplementary evidence show beyond doubt that Tracy is a student who needs specialized instruction and community experiences in each component area of transition services to enable her to achieve her goal of postsecondary education. The Court will require the District to convene a transition planning meeting for Tracy at which and after which the District will provide leadership in planning and implementing necessary transition services for Tracy in compliance with IDEA statutes and regulations and this opinion. The IEP and transition plan must include specific goals and objectives as required by IDEA statutes and regulations.

■■■ The request of the Schramms for an award of compensatory education is denied. Even assuming that the Schramms properly exhausted this claim for relief in the administrative proceeding, they have not shown egregious circumstances or culpable conduct on the part of the District to justify such relief in this case. *See Carlisle Area School v. Scott P.,* 62 F.3d 520, 535–37 (3rd Cir. 1995); *Miener v. State of Missouri,* 800 F.2d 749, 754 (8th Cir.1986). Additionally, Tracy will remain eligible for instruction and services under the IDEA until she reaches twenty-one years of age, and therefore, sufficient time remains for her to benefit from transition services. *Cf. Todd D. v. Andrews,* 933 F.2d 1576, 1584 (11th Cir.1991) (upholding award of compensatory education where student was nearing end of eligibility under IDEA).

*Attorney's Fees*

■■■ The Schramms seek attorney's fees and costs in the total amount of $7,633.71, which includes $4,237.73 incurred at the administrative level and $3,395.98 incurred in the federal district court. The Schramms are represented by a publicly-funded attorney employed by South Dakota Advocacy Services, but this fact is immaterial to whether they are entitled to a fee award. *See Eggers v. Bullitt County School Dist.,* 854 F.2d 892, 898–900 (6th Cir.1988). Congress has provided that "[i]n any action or proceeding brought under [the IDEA], the court, in its discretion, may award reasonable attorney's fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party." 20 U.S.C. § 1415(e)(4)(B). Although this statute gives the Court discretion to award fees, Congress intended the statute to be interpreted consistently with the fee provisions under 42 U.S.C. § 1988 and Title VII of the Civil Rights Act. *Borengasser v. Arkansas State Bd. of Educ.,* 996 F.2d 196, 199 (8th Cir.1993); *Abu–Sahyun v. Palo Alto Unified School Dist.,* 843 F.2d 1250, 1252 (9th Cir. 1988). Thus, the district court's discretion to deny a fee award to a prevailing plaintiff has been interpreted narrowly. *Abu–Sahyun,* 843 F.2d at 1252. A prevailing party should recover an attorney's fee unless "special circumstances" would render the award unjust. *Borengasser,* 996 F.2d at 199. A party is a "prevailing party" if she succeeded on any significant issue which achieved some of the benefit she sought. *Id.* at 200. Rates must be based on those prevailing in the community in which the action arose for the kind and

quality of services furnished, and no bonus or multiplier may be used in calculating the fee award. 20 U.S.C. § 1415(e)(4)(C).

The District objects to the award of attorney's fees arguing that the nature of the legal issues involved in this case, the District's good faith in applying the transition services statutes and regulations, and the parents' lack of out-of-pocket expense for legal representation are special circumstances justifying denial of the fee award. None of the District's proffered "special circumstances" justify denying the Schramms an award of attorney's fees and costs in this case. The Court has already noted that representation by a publicly-funded attorney is immaterial to the fee question. The fact that the legal issues presented may be new and complex to the District does not justify denying a fee award for the Schramms. Finally, the District's good faith attempt to comply with IDEA statutes and regulations is not relevant to the determination of whether special circumstances exist to preclude awarding attorney's fees to a prevailing party. *See Borengasser,* 996 F.2d at 200.

The Court finds that the requested rate of $75.00 per hour is reasonable and reflects a rate below the rate prevailing in the community in which the action arose for the kind and quality of services furnished. The Court finds that the total number of hours expended at the administrative and district court levels are also reasonable. The Court awards the Schramms' attorney the full amount of the requested attorney's fee and costs. Accordingly,

IT IS ORDERED:

(1) that Judgment will be entered in favor of defendants/appellees and against plaintiff/appellant.

(2) that within fifteen (15) days after filing of this Memorandum Opinion and Order and Judgment, the Yankton School District will convene an IEP team meeting to plan special education, related services, and transition services for Tracy Schramm for the current 1995–96 school year and at least annually thereafter.

(3) that the Court awards attorney's fees and costs to counsel for the Schramms in the total amount of $7,633.71, such award to be paid by the Yankton School District to South Dakota Advocacy Services.

### JUDGMENT

In accordance with the Court's Memorandum Opinion and Order filed this date with the Clerk,

IT IS ORDERED, ADJUDGED, and DECREED that Judgment is entered in favor of defendants/appellees and against plaintiff/appellant.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within fifteen (15) days after filing of the Memorandum Opinion and Order and Judgment, the Yankton School District will convene an IEP team meeting to plan special education, related services, and transition services for Tracy Schramm for the current 1995–96 school year and at least annually thereafter.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Court awards attorney's fees and costs to counsel for the Schramms in the total amount of $7,633.71, such award to be paid by the Yankton School District to South Dakota Advocacy Services.