**MANDY S., by and through her mother and next friend SANDY F., Plaintiff,**

v.

**FULTON COUNTY SCHOOL DISTRICT, Defendant.**

**No. CIV.A.1:99–CV–676GET.**

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 30, 2000.

Torin Dana Togut, Office of Torin D. Togut, Roswell, GA, for plaintiffs.

Thomas Alan Cox, Alexa Roberta Ross, Allegra J. Lawrence, Sutherland, Asbill & Brennan, Atlanta, GA, for defendant.

## ORDER

G. ERNEST TIDWELL, District Judge.

The above-styled matter is presently before the court on:

(1) Plaintiff's motion for summary judgment [docket no. 21];

(2) Defendant's motion for final judgment [docket nos.22, 23].

### Procedural History

On May 19, 1998, Mandy S. ("Mandy") requested a due process hearing against Fulton County School District ("School District") that alleged, *inter alia,* that the School District violated Mandy's substantive and procedural rights to receive a free appropriate public education ("FAPE") for the 1991–92 through 1997–98 school years and that she was entitled to compensatory education and reimbursement of private educational expenses for those school years. Mandy was a twenty-one year old adult at the time. An administrative due process hearing was held on August 17, 18, September 23, 24, 25, and November 4, 1998. On February 12, 1999, the Special Assistant Administrative Law Judge ("ALJ") issued a final decision against Mandy which denied her all relief.

On March 12, 1999, Mandy filed this action in district court pursuant to the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.,* and its implementing regulations, 34 C.F.R. §§ 300.1, *et seq.* (1997) seeking a *de novo* review of the administrative proceedings and reversal of the findings of fact and resulting decision, as well as attorneys' fees and costs. On October 5, 1999, this court denied defendant's motion to dismiss.

On February 18, 2000, the parties filed an amended joint motion to waive the pretrial order requirements, stipulating that neither party would initiate a trial or move to introduce additional evidence in this case. The parties also stipulated that they would file cross-motions for final judgment on April 10, 2000, which would be dispositive of all claims, issues, and defenses in this case. The parties' motion was granted on February 24, 2000.

On April 10, 2000, plaintiff filed a motion for summary judgment and defendant filed a motion for judgment. There is some question as to the proper procedural mechanism to be implemented in the district court in bringing an IDEA case before the court for final decision. The Eleventh Circuit has not yet addressed this issue. *See Walker County School District v. Bennett,* 203 F.3d 1293, 1297 n. 11 (11th Cir.2000). Both the Sixth and the Ninth Circuits have noted that a motion for summary judgment under Federal Rule of Civil Procedure 56 may not be an appropriate procedural device for triggering a district court decision because the district court in reviewing the administrative record, whether additional evidence is taken or not, must weigh and decide disputed issues of fact, an improper exercise under Rule 56. *Compare Capistrano Unified School District v. Wartenberg,* 59 F.3d 884, 891–92 (9th Cir.1995) and *Doe v. Metropolitan Nashville Public Schools,* 133 F.3d 384, 387 n. 2 (6th Cir.1998). Having considered the relevant legal authorities, the procedure of filing motions for final judgment appears to this court to be the better practice. Therefore, based on the foregoing and in light of the parties' stipulation, the court will treat plaintiff's motion for summary judgment as a motion for final judgment.

### Standard of Review

Under the IDEA, any party aggrieved by the result of the administrative proceedings in the state system has the right to bring a civil action in the district court. In that lawsuit "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 20 U.S.C. 1415(e)(2).

The Supreme Court has delineated the following guideline for review:

> [A] court's inquiry in suits brought under 20 U.S.C. § 1415(e)(2) is two-fold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these two requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Doe v. Alabama State Dep't of Educ.*, 915 F.2d 651, 655 (11th Cir.1990)(quoting *Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982)).

Reviewing courts must give "due weight" to the record of the administrative proceeding. *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. In *Rowley*, the Supreme Court made it clear that § 1415(e)(2) is not an invitation to the district court to substitute its own judgment on sound educational policy for those made at the state administrative level. *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050. The Eleventh Circuit has recognized that the role of the district court is simply to "review the administrative determinations contemplated by the Act." *Manecke v. School Bd.*, 762 F.2d 912, 919 (11th Cir.1985), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986).

The extent of deference to be given the administrative findings of fact is an issue left to the discretion of the district court. *Jefferson County Board of Educ. v. Breen*, 853 F.2d 853, 857 (11th Cir.1988). The court must consider the administrative findings of fact, but is free to accept or reject them. *Id.* (citing *Town of Burlington v. Department of Educ., Com. of Mass.*, 736 F.2d 773, 792 (1st Cir.1984), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

### Facts

Having reviewed the administrative record in light of the foregoing standard, the court credits the factual findings of the ALJ and finds that they are supported by the preponderance of the evidence in the record. Furthermore, the court independently finds the following facts, many of which the plaintiff admitted in either her statement of material facts or her response to defendant's statement of material facts. On June 28, 1987, Mandy, an eleven year old child, suffered an accident involving a four-wheel all-terrain vehicle. As a result of this accident, Mandy incurred a severe traumatic brain injury ("TBI"). Mandy's brain injury severely affected her abilities to engage in daily activities, perform self-help skills, and to appropriately engage in social interactions with others. Mandy's brain injury also significantly impaired her motor coordination, memory, speech and language.

In the Spring of 1991, Mandy and her family moved to Atlanta, Georgia. Before Mandy enrolled in the School District, the School District provided her with a comprehensive computer evaluation through the Georgia Institute of Technology ("Georgia Tech"). While the Georgia Tech evaluation was being performed, the

School District provided plaintiff with homebound instruction.

Mandy enrolled as a special education student in the School District at age sixteen. Mandy attended Holcomb Bridge Middle School. For the 1992–93 school year, Mandy qualified to receive special education and related services from the School District under the IDEA category of "other health impaired" with the description "traumatic brain injury, left side weakness, walks with quad cane, and balance problems." At the time, the State Department of Education did not recognize a specific classification for TBI.

Plaintiff was enrolled in the special education program at Roswell High School for the 1993–94 through 1996–97 school years. The School District developed an IEP and transition plan for Mandy for the 1992–93 through 1997–98 school years. The School District provided special education services and transition services for Mandy for the 1992–93 through the 1996–97 IEPs until she dropped out of Roswell High School ("RHS") on or about February 10, 1997.

In 1994, the TBI classification became available in Georgia. The State Department of Education advised the School District that TBI students were to be reclassified upon reevaluation. Plaintiff was classified as TBI at her next evaluation in 1995. Mandy was served as TBI in the "Learning Disabilities" program.

Plaintiff's IEPs were developed by a team composed of School District personnel, outside consultants hired by the School District, an attorney for the School District, plaintiff, plaintiff's attorney, and plaintiff's mother. Plaintiff's mother and attorney actively participated in developing the IEPs for the 1991–92 through 1997–98 school years. Their recommendations were, in part, incorporated into the IEPs. Each year, they were informed of the School District's placement and classification of plaintiff. After conferring with counsel, plaintiff's mother signed each resulting IEP indicating their agreement, with the exception of the IEPs for May 24, 1996 and August 19, 1997.

Plaintiff received comprehensive services, including cognitive therapy and other therapies, technological services and equipment for the 1991–92 through 1996–97 school years. Some of these services were provided by School District staff specialists. The School District also hired outside providers to deliver educational services to plaintiff. The School District provided Mandy with a computer and special software which could compensate for some of Mandy's difficulties. The School District paid for a seating and positioning clinic at the Shepherd Spinal Center for Mandy and, as a result of Shepherd's recommendations, the School District purchased a customized office chair with an arm trough and a customized desk to accommodate Mandy's special needs.

The School District provided plaintiff with textbooks on tape because plaintiff could more easily grasp material if she heard it rather than read it. The School District also provided Mandy with an assistant to help her throughout the day. According to Harold Smith, former Director of Programs for Exceptional Children, the School District expended more resources on plaintiff than on any other non-residential student in his twenty years of service to the School District.

The School District provided cognitive therapy through Julie Krupa, a speech language therapist, from January 1995 through the end of that school year. Ms. Krupa gave plaintiff one-to-one cognitive evaluation, assistance and instruction. Ms. Krupa also gave Mandy computer-related training and speech/language-related therapies. She worked directly with School District personnel in a team approach to plaintiff's education.

Prior to the 1996–97 school year, Mandy was on a college preparation diploma course of study at the request of Mandy and her mother. In addition to the academic course work, Mandy received integrated speech, physical, and occupational therapies. Daily living skills also were addressed.

On May 24, 1996, Mandy, her mother, and the School District met to develop an IEP for plaintiff for the 1996–97 school year. At this meeting, Mandy, her mother, and the School District staff agreed that Mandy would not be able to secure a regular high school diploma by the time of her expected graduation in May 1998 and that other options should be considered. The committee proposed that plaintiff receive instruction in study skills, English, personal management, work study and keyboarding. Mandy would receive the keyboard training in a classroom with non-disabled peers. The IEP also had as a goal that Mandy would increase her social awareness and development of social skills. The committee recommended that plaintiff receive occupational therapy, physical therapy, speech therapy and career services.

The School District did not invite anyone from the Division of Vocational Rehabilitation to attend the May 24, 1996 IEP meeting. The School District did, however, refer Mandy to Vocational Rehabilitation to determine her eligibility for its services as part of her 1996–97 transition plan. Mandy was eligible for vocational rehabilitation services.

Dr. Anthony Stringer, Ph.D., completed a neuropsychological evaluation of Mandy at the request of Vocational Rehabilitation on December 13, 1996. Donald Blosser, a counselor for the Division of Vocational Rehabilitation contacted Dr. Stringer about developing a vocational plan for Mandy. Prior to the 1996–97 school year,

Mandy and her mother had rejected services from Vocational Rehabilitation.

The proposed 1996–97 IEP included goals for Mandy to achieve and set out a certain amount of time each week to be spent on most tasks. For example, the speech language therapist recommended no more than 90 minutes of speech therapy instruction per week to increase her speech skills, as well as more speech practice and repetition in other "real life" contexts.

An individual transition plan ("ITP"), necessary for students aged sixteen and older, also was developed for plaintiff on May 24, 1996. According to the School District, plaintiff and her parent had declined information about independent living for Mandy prior to the 1996–97 IEP. At the 1996–97 IEP meeting, plaintiff's counsel asked about career preparation for Mandy.

The Instructional Support Teacher for the Career Services Program, Donna Faulkner, emphasized that the School District was without sufficient information to identify possible post-secondary options for plaintiff and urged plaintiff to complete a vocational assessment. The 1996–97 ITP proposed the following transition objective areas: (1) Post-secondary—vocational training; (2) Employment—supported employment; (3) Personal Management—social/interpersonal & living arrangements; (4) Community Participation—Leisure & Community resources. The transition plan specified that plaintiff would explore available leisure groups in the community. The transition plan included a personal management class to help plaintiff increase her ability to act independently in various settings through role-playing, and covered topics including social interactions, job skills, interview etiquette, restaurant etiquette, and time management. All of the instruction occurred at Roswell High

School. The primary goal of the personal management class was personal independence.

The transition plan also included a worksite experience in the media center at Roswell High School. This work experience was based on Mandy's expressed interest in a career in computers. Ms. Faulkner and Julie Butler also set up a duplication of a job at a collection agency after plaintiff indicated that she would like to work at a collection agency. To set up the collection agency project for plaintiff, Ms. Faulkner visited different collection agencies and task-analyzed the situations so that she could set up a situation in the school to address plaintiff's interests.

Dr. Fjordbak, the neuropsychologist retained to assist in developing educational services for plaintiff, recommended that the treatment team working with Mandy avoid challenging her goals and objectives, even if they seemed unattainable, because plaintiff was so emotionally involved in them. The School District considered Dr. Fjordbak's advice when it created the simulated work situations.

At the 1996–97 IEP meeting, plaintiff stated that she did not want to return to RHS. According to plaintiff, the school environment was overwhelming for her, the students were immature "babies" and she did not have any friends at school. Plaintiff wanted to enter a community based instruction program and continue her education in a private placement. Mandy's mother requested that the School District pay for plaintiff to be trained at the Asher Business School ("Asher"). Ms. Faulkner visited Asher and, based on her observations and interviews with the faculty and staff, determined that the school was unable to provide an appropriate education for Mandy. For example, Ms. Faulkner learned that Asher had never dealt with a TBI student and the school's previous experience with providing accommodations

consisted of a clothespin attached to the student's hand to assist the student with typing.

Mandy and her mother did not sign the May 24, 1996 IEP, however, Mandy did receive services under the IEP until she dropped out of school in February 1997. Until plaintiff withdrew on February 10, 1997, Marilyn Swinehart, in her capacity as case manager, ensured that the objectives and goals of the IEP were implemented. To monitor plaintiff's progress, Ms. Swinehart held meetings for all of plaintiff's providers and collected data from those who worked with plaintiff. Ms. Swinehart met with Mandy's providers to ensure that the necessary modifications or accommodations had been implemented. Due to plaintiff's withdrawal from school, the plans memorialized in the IEP could not be completed, however, Ms. Swinehart testified that Mandy's communication with other students improved during the school year.

On August 19, 1997, the IEP placement committee convened to develop an IEP for Mandy for the 1997–98 school year. Prior to developing the 1997–98 IEP, the School District staff evaluated Mandy to determine her current levels so that goals and objectives could be developed for 1997–98. During the assessments, Mandy's mother interrupted and raised concerns about the evaluations. Mandy's mother also stated that the School District should be sued for its failure to provide Mandy with an education.

The committee reviewed Mandy's mastery of the 1996–97 IEP goals to determine a starting point for the 1997–98 IEP. Mandy had mastered several of her physical therapy and speech therapy objectives and was in the process of mastering several more. Mandy's speech and language skills regressed over the months since she left school. Mandy was in the process of

mastering some of her life skills objectives such as planning her time and completing class assignments. She also mastered her objective of participating in group settings and activities at school at least once a day. She was in the process of mastering her objective of socializing through group interaction in speech therapy.

The IEP placement committee proposed that plaintiff be served as TBI through the "Learning Disability" program in 1997–98. The School District offered a community based instruction program. The committee also proposed that plaintiff receive speech, physical, and occupational therapies, as well as career services each week.

The IEP resulting from the August 1997 meeting incorporated goals and objectives including the improvement of social and vocational behaviors, the improvement of keyboarding skills and the exploration of recreation and leisure skills. The School District was disadvantaged in preparing the 1997–98 IEP because it was not in possession of several evaluations which outside providers had conducted on Mandy since she left RHS. The evaluation by neuropsychologist Dr. Jay Uomoto, however, was provided to the School District by Mandy and the meeting recessed temporarily so that all present could read his report. The School District incorporated some of Dr. Uomoto's suggestions into the IEP. For example, Mandy's schedule was changed to give her an additional period to practice the computer in a room by herself with her assistant.

A transition plan also was developed for Mandy following the 1997–98 IEP meeting. The transition plan proposed objectives in the areas of: (1) Post-secondary—vocational training and career awareness; (2) Employment—supportive employment; (3) Personal Management—social/interpersonal skills, financial planning, and living arrangements; (4) Community Participation—leisure and community resources.

The transition plan includes a personal management course focusing on independent living skills and a work-site experience. The community-based instructional program and some of the independent living skills classes were explained to Mandy and her mother at the IEP meeting.

At the time of the IEP meeting, Mandy and her mother had not provided sufficient information regarding Mandy's preferences and interests to specifically formulate objectives incorporating these interests. The transition plan asked plaintiff to identify post-secondary vocations in which she had an interest, offered information about supported employment programs and Vocational Rehabilitation services, specified that plaintiff would increase management of her personal skills and practice them in community and classroom settings, and provided that plaintiff would explore community resources and leisure activities. The transition plan identifies the Career Services staff, Special Education, other outside agencies, Mandy and Mandy's mother as persons potentially responsible for delivering these services.

No outside agencies were invited to the 1997–98 IEP meeting. Based on the School district's knowledge and experience regarding the services provided by MARTA, the School District itself evaluated which services would be available from MARTA to assist Mandy with her transportation goals. Mandy and her mother rejected the proposed IEP. Mandy and her mother instead developed and implemented a private rehabilitation program to educate plaintiff after she withdrew from the School District.

On October 1, 1997, Mandy moved out of her mother's house and moved into the Grandview Apartments. These apartments are located outside the School District. When Mandy turned 21 years old, she was living in the Grandview Apart-

ments. In fact, Mandy resided outside the boundaries of the School District for all but a few weeks of the 1997–98 school year. According to Mandy, she chose to move out of her mother's home in order to develop an educational program and placement so that she could become more independent and self-sufficient.

### *Discussion*

The stated purpose of the IDEA is to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs. 20 U.S.C. § 1400(d)(1)(A). To effectuate that purpose, federal funds are made available to state and local educational entities which are required through an evaluation process to identify children with disabilities and to develop for each disabled child an annual individualized education program or IEP. *See* 20 U.S.C. §§ 1411, 1414–1415. If the parents of a disabled child are dissatisfied with their child's IEP, the statute requires the educational agency to afford them an impartial due process hearing. 20 U.S.C. § 1415(f).

■ In order to satisfy its duty to provide a free appropriate public education to a disabled child, the state must provide personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. *Drew P. v. Clarke County School Dist.,* 877 F.2d 927, 930 (11th Cir.1989) (citing *Jefferson County Bd. of Educ. v. Breen,* 853 F.2d 853 (11th Cir.1988)), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1510, 108 L.Ed.2d 646 (1990). The state is not required, however, to maximize the handicapped child's potential; rather, the state must provide the child a "basic floor of opportunity," consisting of access to specialized instruction and related services. *Bd. of*

*Educ. v. Rowley,* 458 U.S. 176, 200–01, 102 S.Ct. 3034, 3048, 73 L.Ed.2d 690 (1982).

### *Statute of Limitation for 1994–95 and 1995–96 School years*

■ Plaintiff requests that she be permitted to pursue relief under the IDEA for the 1994–95 and 1995–96 school years. In considering defendant's motion to dismiss, this court has already determined that the statute of limitation applicable to plaintiff's IDEA claims is the two-year statute of limitation applicable to personal injury actions. At that time, however, the court was unable to determine from plaintiff's Complaint when plaintiff's claims had accrued.

■ IDEA claims accrue when the parents know or have reason to know of the injury or event that is the basis for their claim. *Hall v. Knott County Bd. of Educ.,* 941 F.2d 402, 408 (6th Cir.1991). The cause of action accrues when the plaintiff learns (or should have learned) of the injury, whether or not they know that the injury is actionable. *Id.* at 408. Having reviewed the record, the court finds that plaintiff's claims for the 1994–95 and 1995–96 school years are barred by the statute of limitation. To be timely, plaintiff's claims must have accrued within two years prior to her filing her due process request on May 19, 1996. Plaintiff argues that she was not aware of any "harm" related to the 1994–95 or 1995–96 IEP's until May 24, 1996 when she first learned that she would not have enough credits to obtain a regular high school diploma by graduation. Plaintiff is advocating a "guaranteed outcome" standard that is inapplicable to the IDEA. *See Rowley,* 458 U.S. at 192, 208, 102 S.Ct. at 3034, 3052 (IDEA enacted more to open the door for disabled students to public education than to reach a particular level of education).

Plaintiff and her mother, with the assistance of counsel, were active and assertive participants in the creation of the 1994–95 and 1995–96 IEPs. Plaintiff and her mother requested the pursuit of the regular college preparatory diploma. While, in hindsight, this may have been an optimistic endeavor on plaintiff's part, it seems evident to this court that Mandy and her mother were well informed about the extent of Mandy's disabilities at the time the IEPs at issue were adopted. Furthermore, there is no evidence that the School District concealed information regarding Mandy's continued eligibility for special education or her potential for completion of a college preparatory diploma. Likewise, there is no argument or evidence of any procedural defect related to the creation of these IEPs.

Therefore, the court finds that plaintiff's claims accrued when Mandy and her mother signed and accepted the 1994–95 and 1995–96 IEPs. *Accord Leake by Shreve v. Berkeley County Bd. of Educ.*, 965 F.Supp. 838, 846 (N.D.W.Va.1997)(parent who signed Education Plan form and knew daughter was not receiving special education services barred from bringing compensatory education claim when daughter subsequently qualified for special education). Accordingly, plaintiff's May 19, 1998 claim with regard to the 1994–95 and 1995–96 IEPs is time-barred.

### 1996–97 IEP and Transition Services/Compensatory Education

■ "An IEP is a snapshot, not a retrospective. In striving for 'appropriateness' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, the time that the IEP was promulgated." *Frank S. v. School Comm. of the Dennis–Yarmouth Reg'l Sch. Dist.*, 26 F.Supp.2d 219, 226 n. 15 (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir.1990)). Having reviewed the record, the court

finds that the 1996–97 IEP was appropriate.

The 1996–97 IEP was developed with the participation of plaintiff, her mother and their counsel, and the School District. It included observations regarding Plaintiff's current abilities and interests and set forth specific goals and objectives in all necessary areas. Functional learning opportunities were included, as well as computer skills training and the creation of two work sites utilizing computer skills. The IEP provided opportunity for plaintiff to work on daily living skills and social awareness such as time management and restaurant etiquette.

Although plaintiff contends that the 1996–97 IEP was deficient because it did not propose a community-based program, at the time of the 1996–97 IEP meeting, plaintiff did not request a community based program. Rather, plaintiff wanted to attend the Asher Business School to prepare for a career in computers. In any event, the court notes that the School District was unable to introduce independent living skills in preparation for a community-based program prior to 1996–97 due to plaintiff's insistence upon a college preparation education.

■ The 1996–97 transition plan provided for services in all areas contemplated by the IDEA and, thus, the School District was not required to indicate reasons why certain services were not provided. *See eq. Yankton School District v. Schramm,* 900 F.Supp. 1182, 1193 (D.S.D.1995), *aff'd,* 93 F.3d 1369 (8th Cir.1996)(identifying three areas specified in 34 C.F.R. § 300.18(b)(2)). Mandy was given an open referral to Vocational Rehabilitation where she was referred for and received a neuropsychological evaluation in preparation for the development of a vocational plan.

Plaintiff did, in fact, gain educational benefit from the 1996–97 IEP before her

withdrawal from RHS. She had mastered or was in the process of mastering many of her speech and physical therapy goals. Plaintiff had increased her rate of typing and was in the process of increasing her independent use and application of the computer. Therefore, the court finds that the 1996–97 IEP was appropriate for plaintiff's individual needs and reasonably calculated to confer an educational benefit.

### 1997–98 IEP and Transition Services/Reimbursement

 Plaintiff seeks reimbursement of expenses related to her private education instruction and services for the 1997–98 school year. The Eleventh Circuit has recognized that reimbursement is an available remedy when the public school IEP is found to be statutorily insufficient and the private schooling chosen by the parents of a disabled child is found to be appropriate. *See e.g., Walker County School Dist. v. Bennett,* 203 F.3d 1293, 1296 n. 8 (11th Cir.2000)(citing *Breen,* 853 F.2d at 857). When the court ultimately determines that "the IEP proposed by the school officials was appropriate, the parents [are] barred from obtaining reimbursement." *School Comm. of the Town of Burlington v. Department of Educ.,* 471 U.S. 359, 374, 105 S.Ct. 1996, 2004, 85 L.Ed.2d 385 (1985).

After reviewing the record, the court agrees with the ALJ that the 1997–98 IEP and transition plan were appropriate and capable of conferring an educational benefit. The IEP was based on the available information regarding plaintiff's current abilities, interests and preferences. Computer instruction and assistance, as well as speech/language services were included in the IEP. The IEP identified specific goals and objectives for plaintiff to address in these areas.

Likewise, the IEP adequately provided for transition services. The 1997–98 ITP proposed that plaintiff be taught in a community-based instruction program. Furthermore, the ITP identified specific objectives in the required major categories specified in 34 C.F.R. § 300.18(b)(2)(I)-(b)(2)(iii) and therefore, no additional statements were required.

 Although no outside agencies were invited to the IEP, such procedural noncompliance with the IDEA is not violative unless it actually results in "substantial deprivation" to the student. *See Urban v. Jefferson County School Dist.,* 89 F.3d 720, 726 (10th Cir.1996). In the instant case, the School District was capable of discussing the programs offered by outside agencies such as Vocational Rehabilitation and MARTA. Furthermore, Vocational Rehabilitation was not likely to provide transition services to Mandy because she rejected those services.

 Furthermore, with regard to expenses incurred after Mandy moved to the Grandview apartments in October 1997, the court finds that Mandy was not a resident of Fulton County and does not have standing to assert a reimbursement claim against the School District for that period. As an adult at the time of the move, it is plaintiff's residence and not that of her mother which determines the school district responsible for providing FAPE. *See* 20 U.S.C. § 1415(m)(1).

It is undisputed that the Grandview Apartments are located outside of the Fulton County School District. A school district must provide services only to students residing within its jurisdiction. *See* 20 U.S.C. § 1413(a); O.C.G.A. § 20–2–133(a)(free instruction provided to eligible children who enroll in programs within local school system in which they reside); *Susan R.M. v. Northeast Indep. Sch. Dist.,* 818 F.2d 455, 458–59 (5th Cir.1987)(school district not required to disregard established rules of residency). Although plaintiff attempts to argue that the move to the

Grandview was necessary for plaintiff to receive an education and therefore should be treated more like a private school placement, there is no evidence to support this claim. Even assuming plaintiff could not receive a beneficial education while living in the same home as her mother, there is no evidence that a move outside the district to the Grandview was necessary for plaintiff to develop independent living skills.

In light of the foregoing, the court finds that the School District substantially complied with the procedural requirements of the IDEA and that the IEPs and transition plans developed for Mandy for the 1996–97 and 1997–98 school years were appropriate and reasonably calculated to enable Mandy to receive educational benefits. Because the court finds that the 1997–98 proposed IEP was appropriate, it is unnecessary for the court to consider whether plaintiff's private education plan was appropriate.

Therefore, defendant's motion for final judgment [docket nos. 22, 23] is GRANTED and plaintiff's motion for final judgment ("a/k/a/ motion for summary judgment") [docket no. 21] is DENIED as to all of plaintiff's claims.

### Summary

(1) Plaintiff's motion for summary judgment (a/k/a motion for final judgment) [docket no. 21] is DENIED;

(2) Defendant's motion for final judgment [docket nos. 22, 23] is GRANTED.