_____

95-3343
_____

Yankton School District,           *
                                   *
        Appellant,                 *
                                   *   Appeal from the United States
        v.                         *   District Court for the
                                   *   District of South Dakota.
Harold and Angie Schramm,          *
                                   *
        Appellees.                 *
_____

Submitted:  May 17, 1996


Filed:    August 22, 1996
_____

Before MAGILL, ROSS, and MURPHY, Circuit Judges.
_____

MURPHY, Circuit Judge.


        Harold and Angie Schramm sought transition services for their orthopedically impaired daughter, Tracy, to assist her passage from high school to independent living at college.  The district court[1] determined that the Yankton School District continued to be responsible for providing Tracy with services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et. seq.  The court also awarded the Schramms attorney fees and costs as the prevailing parties.  The school district appeals from the judgment.  We affirm with one modification.

_____

        [1]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

Tracy Schramm is now eighteen years old and will be a senior this fall at Yankton High School. She was born with cerebral palsy and has been classified as orthopedically impaired since the third grade. As a result of her impairment, her hand strength is weak, her right hand is stiff and lacks dexterity, her hand-eye coordination is limited, she writes and types slowly, and she uses a walker for short distances and a wheelchair for longer ones. She cannot function independently in her personal life. She needs help in getting dressed, putting on her shoes, pouring beverages, cooking, and cleaning. She cannot drive a car. Although she has learned to play the saxophone, she cannot play at certain speeds.

Due to Tracy's orthopedic impairment, she entered the school district's special education program in the fall of 1979 as a preschool student. From that time she began to receive special instruction and related services tailored to her needs through an individualized education program (IEP). Her last written IEP, dated May 10, 1993, included only adaptive physical education, physical therapy, and transportation. Yankton School District has provided her with several additional services, however, not specified in her IEP. These include assistance in moving between classes, getting on and off the school bus, going up and down stairs in the school building, carrying a lunch tray, and setting up the saxophone she plays in the band. The school district has also provided Tracy with shortened writing assignments, photocopies of her teachers' class notes, computers for certain classes, special instruction on how to type with one hand, and four separate sets of text books for her home and school use so that she need not carry books from one location to another.

These services and specialized instruction have enabled Tracy to participate in the regular classes at school. She has earned grades in the "A" range by studying four to five hours a night,

five nights a week.  In addition to her class work, Tracy has participated in the school band, newspaper, and a public speaking program.  She hopes to attend college and study civil engineering and computer science.

In March 1994, two weeks before Tracy's sixteenth birthday, the school district met with Tracy and her mother to discuss providing transition services under IDEA.  Transition services include instruction, community experiences, and training in daily living skills that prepare students about to leave high school for independent living, postsecondary education, and community participation.  See 20 U.S.C. § 1401(a)(19).  Because of Tracy's desire to attend college away from home, she wanted specially designed instruction in driver's education, self-advocacy, and independent living skills such as cooking and cleaning.  The Schramms received limited information from the school district but signed a transition plan that placed nearly all responsibility for Tracy's transition planning on them.

In early June 1994, at the end of Tracy's ninth grade school year, the Schramms learned that the district planned to dismiss Tracy from its special education program under IDEA.  Tracy's parents wrote a letter to the Yankton High School Principal, Dr. David Bitter, expressing their disagreement with the planned dismissal.  Shortly thereafter, Tracy and her parents met with Dr. Bitter and other school personnel to discuss the matter.  Physical education was not provided beyond the ninth grade, and the district informed the Schramms that Tracy had satisfied its requirements in that area.  Since Tracy's last IEP had offered special education only in physical education, the district felt Tracy no longer had special education needs under IDEA.  On the addendum attached to Tracy's IEP that day, Tracy's mother wrote that the Schramms disagreed with the district's decision and believed that Tracy remained eligible for special education.  Nevertheless, the district dismissed Tracy from its special education program under

IDEA.

Two weeks later, the South Dakota Advocacy Services, a publicly funded legal services group which had been working with the Schramms during the past year, wrote a letter on their behalf to the school district. The letter explained the Schramms' disagreement with the district's decision that Tracy was ineligible for special education under IDEA. It stated that Tracy would have many transition needs requiring specialized instruction, which the district had failed to consider properly. For these reasons, the Schramms requested an impartial due process hearing.

A due process hearing was held before a state appointed hearing examiner on August 22, 1994. See 20 U.S.C. § 1415(b)(2). The examiner determined that Tracy remained eligible for IDEA benefits because the specially designed instruction and related services not included in the May 1993 IEP were in fact necessary as a result of her orthopedic impairment. In addition, the examiner stated that the transition services Tracy needed because of her impairment also constituted a type of special education. The examiner concluded that Tracy should receive the requested transition services and that the district's March 1994 transition plan improperly shifted responsibility for such transition planning to Tracy's parents. Finally, the examiner noted that he was inclined to award attorney fees to the Schramms but believed he lacked the authority to do so.

The school district appealed the examiner's decision to the district court. See 20 U.S.C. § 1415(e)(2). Following a hearing in August 1995, the court held that Tracy qualified for a free appropriate public education under IDEA. Yankton School District v. Schramm, 900 F. Supp. 1182 (D.S.D. 1995). It based Tracy's eligibility under IDEA on its finding that her orthopedic impairment necessitated the specially designed instruction and related services she had been receiving from the school district.

4

It ordered these to be included in her IEP for the 1995-96 school year, and at least annually thereafter.  The district court also found that Tracy's impairment adversely affected her educational performance because she would not be able to benefit from regular classroom instruction without the instructional modifications and related services that made it possible for her to achieve.  The court held that the March 1994 transition plan failed to comply with IDEA requirements and ordered that a new plan be formulated with specific goals and objectives to enable Tracy to attend college.

The district court went on to address the Schramms' request for an award of compensatory education services and attorney fees.  The Schramms had requested extra months of transition services to compensate for the failure to provide for appropriate transition services beginning in April 1994, when Tracy turned 16.[2]  The court denied the request on the basis that Tracy would remain eligible for transition services until age 21 and there were no egregious circumstances to justify such relief.  The Schramms' request for $7,633.71 in attorney fees and costs was granted, however.  The district had objected to an award of fees based on the novelty of legal issues involved in the case, its good faith in applying the statute, and the Schramms' free legal representation.  The court found that none of these factors justified denying a fee award to the Schramms as the prevailing parties.

The school district argues on appeal to this court that the district court erroneously determined that Tracy qualified as a disabled child under IDEA and that it abused its discretion in granting attorney fees to the Schramms.

---

[2]The Schramms had made the same request in its brief at the administrative hearing level, but the hearing examiner's decision did not address it.

## II.

The Individuals with Disabilities Education Act of 1990, originally enacted in 1975 as the Education for All Handicapped Children Act (EHA), ensures that all children with disabilities have access to "a free appropriate public education."  20 U.S.C. § 1400(c); Board of Educ., Etc. v. Rowley, 458 U.S. 176, 203 (1982).  At the time of EHA's passage, an estimated 1.75 million handicapped children were not receiving any educational services and another 2.5 million were not receiving an appropriate education.  Rowley, 458 U.S. at 191.  EHA was intended to provide a "basic floor of opportunity" by opening the door of public education to disabled children, with the hope of integrating them in regular classrooms as much as possible.  Id. at 192; Light v. Parkway C-2 School District, 41 F.3d 1223, 1227 (8th Cir. 1994); cert. denied, 115 S.Ct. 2557 (1995).

All children with disabilities, such as an orthopedic impairment, "who, by reason thereof, need special education and related services" fall within IDEA's scope.  Id. § 1401(a)(1)(A).  "Special education" means "specially designed instruction . . . to meet the unique needs of a child with a disability," and includes instruction in the classroom, home, and in physical education.  Id. § 1401(a)(16).  "Related services" include physical therapy, "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education . . . ."  Id. § 1401(a)(17).

A "free appropriate public education" under IDEA requires special education and related services from preschool through secondary school, tailored to a disabled child's unique needs by means of an "individualized education program" or IEP.  20 U.S.C. § 1401(a)(18).  An IEP is a written statement developed by school officials, teachers, the parents, and the child if appropriate,

6

that is reviewed and subject to revision at least annually. <u>Id.</u> §§ 1401(a)(20), 1413(a)(11). It must include the child's present educational level and goals, specific educational services to be provided, needed transition services, and criteria for progress evaluation. <u>Id.</u> § 1401(a)(20).

The transition services available under IDEA for disabled children consist of

> a coordinated set of activities for a student, designed within an outcome-oriented process, which promotes movement from school to post-school activities, including post-secondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation. The coordinated set of activities shall be based upon the individual student's needs, taking into account the student's preferences and interests, and shall include instruction, community experiences, the development of employment and other post-school living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

<u>Id.</u> § 1401(a)(19). A statement of a child's needed transition services and the anticipated dates of initiation and duration must be included in his or her IEP beginning no later than age 16, and annually thereafter. <u>Id.</u> § 1401(a)(20)(D) & (E). A statement of the interagency responsibilities for these transition services must be included, when appropriate, before the student leaves the school setting. <u>Id.</u> § 1401(a)(20)(D).

IDEA provides significant procedural safeguards to ensure that parents and guardians actively participate in their child's education. <u>Id.</u> § 1415; <u>Rowley</u>, 458 U.S. at 205. Parents help formulate their child's IEP and are entitled to notice of proposed changes in the educational program. 20 U.S.C. § 1415(b)(1)(C). If disagreements arise, an impartial due process hearing is held, <u>id.</u> § 1415(b)(2), following which any aggrieved party may file a civil action in state or federal court. <u>Id.</u> § 1415(e)(2). A court has

7

discretion to award reasonable attorney fees as part of the costs to the parents if they are the prevailing party.  Id. § 1415(e)(4)(B).

In suits brought under § 1415(e)(2), a reviewing court must independently determine, based on a preponderance of the evidence, and giving "due weight" to the state administrative proceedings, whether the state has complied with IDEA's requirements.  Rowley, 458 U.S. at 206; Independent School District No. 283 v. S.D., 88 F.3d 556, 560 (8th Cir. 1996).  A state must have adopted the "plan, policies, and assurances required by the Act" to provide free appropriate public education for all children with disabilities, and have created an IEP for the individual child in conformance with the statutory requirements.  Id. at 206 n.27. If the content of an IEP is being challenged, a court must also assess whether it is "reasonably calculated to enable the child to receive educational benefits."  Id. at 207.  Courts are not to rely on their own notions of educational policy, however.  Id. at 206, 208; Petersen v. Hastings Public Schools, 31 F.3d 705, 707 (8th Cir. 1994) (review of the state administrative decision "is, in reality, quite narrow").  A district court's findings of fact must be upheld unless clearly erroneous.  Parkway C-2 School District, 41 F.3d at 1229.

**A.**

The heart of the dispute in this case concerns whether Tracy still has a disability within the meaning of IDEA which entitles her to a free appropriate public education.  20 U.S.C. § 1400(c).  If Tracy's disability falls within the scope of IDEA, then the school district, in conjunction with her parents and Tracy, must create an IEP that provides for the special education and related services she needs as a result of her disability.  Id. § 1401(a)(18); Rowley, 458 U.S. at 206 n.27.  Because Yankton School District dismissed Tracy from its special education program

8

when she finished ninth grade, it did not create a new IEP for her tenth grade year.[3]  This appeal therefore does not focus on a disputed portion of an IEP, but whether an IEP comporting with statutory requirements needs to be furnished.  Since she became 16 in April 1994, Tracy's IEP would have to include a statement of any needed transition services, the anticipated dates for their initiation and duration, and, if appropriate, the interagency responsibilities for them.  Id. § 1401(a)(20).  The types of transition services that Tracy requested, such as driver's education, self-advocacy, and independent living skills, are not beyond the statutory scope.  Id. § 1401(a)(19).

Tracy is a disabled child under IDEA because the orthopedic impairment caused by her cerebral palsy still requires "special education and related services."[4]  Id. § 1401(a)(1)(A).  Special education is "specially designed instruction . . . to meet the unique needs of a child with a disability," and includes instruction in the classroom, home, and in physical education.  Id. § 1401(a)(16).  Tracy's unique needs include slowness and fatigue when writing and stiffness and lack of dexterity in her right hand.  To meet her needs, Tracy's teachers shortened or modified the length and nature of her writing assignments, provided her with copies of their notes, and taught her how to type using only her left hand and the first finger of her right hand.  None of this individualized instruction would have been necessary but for her

---

[3]Pursuant to IDEA's "stay-put" provision, the school district did not fashion a new IEP for Tracy until the district court issued its order in September 1995.  See 20 U.S.C. § 1415(e)(3) (disabled child "shall remain in the then current educational placement" during pendency of administrative or judicial review).

[4]The dissent describes the issue in this case as "whether a student who is capable of achieving academic success without special education programs is nevertheless entitled to transition services . . . ."  Neither the district nor the Schramms dispute that Tracy continues to require the special services discussed in the text.  The legal question is thus whether those services constitute "special education and related services" under the IDEA.

orthopedic impairment.

The district has also provided related services to address Tracy's slowness in walking and lack of hand strength. Related services include "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education . . . ." Id. § 1401(a)(17). Tracy receives transportation to school by a lift bus, mobility assistance in the school building, and assistance in carrying her lunch tray and setting up her saxophone for band practice. The district also provides separate textbooks at different locations so that Tracy need not carry them with her. These supportive services comport with Congressional intent to integrate children with disabilities, like Tracy, with children who are not disabled.[5] See Rowley, 458 U.S. at 202-03; Parkway C-2 School District, 41 F.3d at 1227.

Although Yankton School District acknowledges that Tracy has an orthopedic impairment, it argues that a regulation adopted under IDEA forecloses her eligibility because her impairment does not adversely affect her educational performance. See 34 C.F.R. § 300.7(b)(7) (an orthopedic impairment is "a severe orthopedic impairment that adversely affects a child's educational performance"). In its view, Tracy was eligible for special education in her last IEP only because her disability affected her performance in physical education. Once she completed ninth grade, the district was no longer required to provide her with physical education, and her need for special education thus ended. Since Tracy receives excellent grades, the district reasons that Tracy's impairment does not affect her ability in any other area, which means she is not disabled within the meaning of IDEA. It cites

---

[5]The days when special education implied separate education are over. Congress knew and intended that special education would take place in regular classes. 20 U.S.C. § 1412(5)(B).

10

<u>Board of Educ., Etc. v. Rowley</u>, 458 U.S. 176 (1982), in support.

<u>Rowley</u> turned on the content of an eligible child's IEP. The issue there was whether a particular education service had to be furnished, that is whether a hearing-impaired student was entitled to a sign language interpreter. <u>Rowley</u>, 458 U.S. at 184. The student was already receiving personalized instruction in a regular classroom, had higher than average grades, and was advancing easily from grade to grade. <u>Id.</u> at 209-10. The Supreme Court reasoned that her performance showed that her IEP already provided sufficient educational benefit without the requested interpreter. <u>Id.</u> The focus on her performance occurred in the context of deciding whether adequate services were being provided. In the case before the court the school district determined that Tracy was not eligible for any IDEA services after she finished ninth grade. The issue here is not whether current IDEA services are adequate, but whether Tracy remains entitled to receive any benefits under IDEA.

The school district acknowledges that <u>Rowley</u> did not decide any issue of eligibility under IDEA, but it believes the opinion's discussion of the statute's background is favorable to its position. <u>Rowley</u> noted that IDEA's predecessor, EHA, required states to educate handicapped children who were receiving no education or an inadequate one. 458 U.S. at 181. In the district's view, Tracy can receive an adequate education without IDEA services despite her handicap. Tracy's continued eligibility under IDEA does not rest just on the presence of an orthopedic impairment, however. Her eligibility continues because that impairment requires specially designed instruction in the classroom and mobility assistance and other related services that help her to benefit from that education. <u>See</u> 20 U.S.C. § 1401(a)(1)(A).

The regulation defining an orthopedic impairment, 34 C.F.R. § 300.7(b)(7), does not make Tracy ineligible for IDEA services.

11

The definition requires that the impairment adversely affect a child's educational performance, but the regulation does not elaborate on what is meant by an adverse affect on performance. The record here establishes that but for the specialized instruction and services provided by the school district, Tracy's ability to learn and do the required class work would be adversely affected by her cerebral palsy. For example, without the specially designed instruction in one-handed typing and shortened writing assignments, Tracy would have difficultly taking notes or completing her assignments. Without the mobility assistance services and provision of multiple text books, Tracy would be late to class and unable to take her books. Tracy's academic success has depended on these special measures and her long hours of study. Her impairment would adversely affect her performance in the regular classroom setting absent the personalized instructions and supplementary services she has received.[6] Even though the district failed to include these services in her last IEP, her need for them did not end upon her completion of the district's physical education requirements. Application of the regulation would not

---

[6]The district court specifically found that "Tracy's orthopedic impairment adversely affects her educational performance." Schramm, 900 F. Supp. at 1191. For example, Tracy received the teacher's notes in several classes because "she writes too slowly to take adequate notes." Id. at 1189. We are bound by these factual determinations since they are not clearly erroneous. Light v. Parkway C-2 School District, 41 F.3d 1223, 1229 (8th Cir. 1994). Likewise, the hearing examiner found that the special education and related services the district had been providing Tracy were "appropriate and, in fact, necessary for Tracy's continued enrollment in the regular curriculum." This finding is entitled to due weight. Independent School District No. 283 v. S.D., 88 F.3d 556, 560 (8th Cir. 1996).

A very bright, disciplined, and determined student, Tracy appears to be headed for college. Preparing disabled students for postsecondary education is one of the reasons for transition services under the IDEA. 20 U.S.C. § 1401(a)(19). Under the statute, her success in high school, due in part to the special education she receives, should not prevent her from receiving whatever transition services she may need to be equally successful in college.

12

bar consideration of her claim under IDEA.

The school district provides Tracy with physical therapy, extra textbooks, mobility assistance between classes, modified writing assignments, and a modified chemistry lab station. It argues, however, that it provides them under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, not under IDEA.

Although an individual who is eligible for services under IDEA may also qualify for assistance under the Rehabilitation Act of 1973, the school district must comply with both statutes. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of handicap in a variety of programs and activities receiving federal aid. See 29 U.S.C. § 794(a).[7] Both § 504 and IDEA have been interpreted as requiring states to provide a free appropriate public education to qualified handicapped persons, but only IDEA requires development of an IEP[8] and specifically provides for transition services to assist students prepare for a post-high school environment. See 20 U.S.C. § 1401(a)(20). Under the statutory scheme, the school district is not free to choose which statute it prefers, as Yankton School District acknowledges in its reply brief.[9]

---

[7] 29 U.S.C. § 794(a) provides in relevant part that

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency of the United States Postal Service.

[8] An IEP developed in accordance with IDEA may sometimes be used to show compliance with § 504. See 34 C.F.R. § 104.33(b)(2).

[9] The dissent suggests that we are second-guessing the school district's assessment of Tracy's educational needs because the district's determination that she is not eligible for IDEA services
is a matter of educational policy within its expertise. The district explicitly asserted that this is not its position. See

13

If a student is eligible under IDEA, appropriate services, including transition benefits, shall be provided. Id. § 1401(a)(20). That some of those services may also be mandated by the Rehabilitation Act does not mean they are not "specially designed instruction" under IDEA. Since Tracy still requires and receives special education and related services as defined by IDEA, the district remains obligated to cooperate in fashioning an IEP for the coming year to include necessary transition services. Id.

**B.**

The school district also contends that the district court erred in stating that Tracy's eligibility for transition services under IDEA would continue until age 21. The district court made this statement during its discussion of the Schramms' request for an award of compensatory education in the area of transition services. In denying any compensatory award, the court reasoned that Tracy's eligibility for transition services until age 21 would give sufficient time for her to benefit from them.

All children with disabilities are generally entitled to a free appropriate public education under IDEA between the ages of 3 and 21. 20 U.S.C. § 1412(2)(B). An exception exists where state law or practice does not provide for free public education for students between the ages of 18 and 21. Id. Under South Dakota law, a free public education is provided until a student has

---

Appellant's Reply Brief at 8 n.1. It acknowledges that whether or not a child is entitled to receive services under IDEA is statutorily defined and not a matter of educational policy. While school authorities are better situated than courts to determine what educational practices and materials to include in a child's IEP, they may not choose to exclude qualified children from receiving IDEA services. See Rowley, 458 U.S. at 208 ("once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States").

completed the secondary program or reached the age of 21. SDCL § 13-28-5. Tracy plans on graduating from high school at the end of the 1996-97 school year, at which time she will be 19 years old. Assuming that she graduates as planned, the district is correct that it will not be responsible for providing her with transition services under IDEA after her completion of high school.[10]  20 U.S.C. § 1412(2)(B).

## C.

Finally, the school district argues that the district court abused its discretion in awarding the Schramms attorney fees and costs. It points out that the Schramms received free legal representation by a publicly funded group called the South Dakota Advocacy Services, and contends that an award penalizes it for grappling with complex legal issues in the attempt to comply with IDEA requirements.

Under the statute, a court has discretion to award reasonable attorney fees as part of the costs to prevailing parents or guardians of a child or youth with a disability. Id. § 1415(e)(4)(B). A party prevails if it succeeded on any significant issue which achieved some of the benefit it sought. Borengasser v. Arkansas State Bd. of Educ., 996 F.2d 196, 200 (8th Cir. 1993). Unless "special circumstances" exist to make an award

---

[10]The Schramms concede that Tracy's eligibility for transition services will most likely end upon her graduation from high school. They argue that they are nevertheless entitled to these services as an award of compensatory education because the school district failed to provide adequate transition services from March 1994 to September 1995, the date a new IEP was constructed per the district court's order. Because the Schramms have not appealed the district court's decision denying their request for compensatory education, that issue is not properly before us. See National Farmers Union Standard Ins. Co. v. Souris River Telephone Mut. Aid Co-op., 75 F.3d 1268, 1271 (8th Cir. 1996).

unjust, attorney fees should ordinarily be awarded to the prevailing party. Id. at 199. We review an award of fees for abuse of discretion. Id.

The award of attorney fees and costs to the Schramms was not an abuse of discretion. The Schramms were the prevailing parties because they succeeded on the issues of Tracy's eligibility under IDEA and entitlement to transition services. The fact that they were represented by publicly funded counsel does not affect their right to fees. See Eggers v. Bullitt County School Dist., 854 F.2d 892, 899 (6th Cir. 1988). Nor does the fact that the school district may have acted in good faith. Borengasser, 996 F.2d at 200. No special circumstances exist to justify denial of an award to the Schramms as prevailing parties. See id.

### III.

In sum, Tracy remains eligible as a disabled child under IDEA for transition services and other benefits until she graduates from high school (or reaches the age of 21 without having graduated). With this modification of the district court's disposition, the judgment is affirmed.

MAGILL, Circuit Judge, dissenting.

I respectfully dissent. The real issue of this case is who is to foot the bill for Ms. Schramm's transition from high school to college: Ms. Schramm and her parents, or the Yankton School District. Ms. Schramm is a demonstrably bright, academically gifted student who requires no special education programs to excel in her course work. This case therefore presents the legal question of whether a student who is capable of achieving academic success without special education programs is nevertheless entitled to transition services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1490o. Contrary to the

16

majority, I do not believe that Congress intended to mandate this delivery of patently unnecessary services.

The majority declares that "Tracy is a disabled child under IDEA because the orthopedic impairment caused by her cerebral palsy still requires 'special education and related services.'" Maj. Op. at 9 (quoting 20 U.S.C. § 1401(a)(1)(A)). I disagree with this pivotal conclusion. While Tracy is undeniably "disabled" under various definitions, including Section 504 of the Rehabilitation Act of 1974, 29 U.S.C. § 794, and is therefore entitled to reasonable accommodations such as modified transportation assistance, the IDEA has a specialized definition which Tracy simply does not meet.

20 U.S.C. § 1401(a)(1)(A) provides that:

The term "children with disabilities" means children--

    (i) with . . . orthopedic impairments . . . ; and

     (ii) who, by reason thereof, <u>need special education and related services</u>.

(emphasis added). Under 34 C.F.R. § 300.7(b)(7), an "'[o]rthopedic impairment' means a severe orthopedic impairment that adversely affects a child's educational performance." Here, Ms. Schramm's educational performance clearly has not been adversely affected by her impairment, and she does not require special education programs.[1] As the majority

---

[1]The regulations define "special education" as

specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including--

    (i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and

    (ii) Instruction in physical education.

34 C.F.R. § 300.17(a)(1). <u>See also</u> 34 C.F.R. § 300.17 n.1 ("The

17

acknowledges, Ms. Schramm is an "A"

---

definition of special education is a particularly important one under these regulations, since <u>a child does not have a disability under this part unless he or she needs special education</u>." (emphasis added)).

level student bound--unlike, I would venture, many of her nondisabled classmates--for college.  The last "special education" required by Ms. Schramm was for physical education; because her physical education requirements were met, the Yankton School District appropriately discontinued Ms. Schramm's special education program.[2]

The purpose of the IDEA is not to "require states to provide each handicapped child with the best _possible_ education at public expense," Petersen v. Hastings Pub. Sch., 31 F.3d 705, 708 (8th Cir. 1994) (quotations and citation omitted, emphasis in original), but rather to "assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs . . . ."  20 U.S.C. § 1400(c).  Ms. Schramm has received a free appropriate education which has met her special needs.  Ms. Schramm has achieved considerable success in her education, and the Yankton School District determined that Ms. Schramm was no longer in need of special education services.  This

---

[2]The majority assumes that, were the school district to deny Ms. Schramm every reasonable accommodation to her disability, her academic performance would be adversely affected by her impairment.  See Maj. Op. at 12.  While I tend to believe that Ms. Schramm's academic success is more dependent on "her long hours of study" than on "these special measures," id., I note that all of the accommodations provided to Ms. Schramm are mandated by § 504.  Because Ms. Schramm will continue to receive these reasonable accommodations regardless of her status under the IDEA, I perceive no reason to disregard their existence and to speculate on what impact Ms. Schramm's impairments could have on her academic performance without them.

determination was fully supported by the facts of this case, and by the IDEA and its enabling regulations.

Because Ms. Schramm did not meet the regulatory definition of disabled, the IDEA has not been violated by the Yankton School District's decision that Ms. Schramm was no longer entitled to special education services, and Ms. Schramm is not entitled to transition services. "In assuring that the requirements of the [IDEA] have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States." Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982). Ignoring that "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," id. at 208 (quotations and citation omitted), the majority now second-guesses the Yankton School District's assessment of Ms. Schramm's educational needs.[3] I dissent.

---

[3]As acknowledged by the school district, the issue in this case is not whether the school district can choose to supply an eligible student with special education services. See Appellant's Reply Br. at 8 n.1 ("It is not the District's position that the District could refuse to provide special education to an eligible student under the guise of 'educational methodology' as alleged by Appellees; it is, however, the school's position that a student may be eligible for services pursuant to Section 504 but not for services pursuant to IDEA."). Rather, the issue is whether Ms. Schramm's orthopedic disability necessitates special education at all, a matter which clearly is within the school district's expertise. The school district has determined that Ms. Schramm only required special education services for her physical education needs, which have already been met. Despite acknowledging that "school authorities are better situated than courts to determine what educational practices and materials to include in a child's IEP," Maj. Op. at 14 n.9, the majority nevertheless mandates that the school district now provide a far broader range of special education services than found necessary by the school district. In light of this, I find the majority's apparent objection that it is not second-guessing the school district's assessment of Ms. Schramm's needs, see id. at 13-14 n.9, less than convincing.

20

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.