145 F.3d 95
 127 Ed. Law Rep. 36
 Henry MULLER, on Behalf of Treena MULLER, a minor, and
Catherine Muller, on Behalf of Treena Muller, a
minor, Plaintiffs-Appellees,
v.
COMMITTEE ON SPECIAL EDUCATION OF the EAST ISLIP UNION FREE
SCHOOL DISTRICT and Board of Education of the East
Islip Union Free School District,
Defendants-Appellants.
 No. 97-7201.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 8, 1997.
Decided May 22, 1998.
 
 1
 Michael E. Deffet, Long Island Advocacy Center, Inc., Hauppauge, NY, for Plaintiffs-Appellees.
 
 
 2
 Christopher Venator, Ingerman Smith, L.L.P., Northport, NY, for Defendants-Appellants.
 
 
 3
 Before: KEARSE and CABRANES, Circuit Judges, and CHIN, District Judge.*
 
 
 4
 CHIN, District Judge.
 
 
 5
 The principal issue in this case is whether Treena Muller ("Treena"), a minor, qualified for benefits under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 et seq. (1994) (amended 1997),[1] as a child with a "serious emotional disturbance." Defendants-appellants Committee on Special Education of the East Islip Union Free School District and Board of Education of the East Islip Union Free School District (together, the "District") determined that she did not qualify, and on administrative review, an Impartial Hearing Officer and a State Review Officer agreed. The district court, however, concluded that Treena did qualify. Accordingly, the district court vacated the administrative decision, ordered the District to classify Treena as having an emotional disability under the IDEA, and awarded compensatory damages and attorneys' fees. We affirm.
 
 STATEMENT OF THE CASE
 A. The Facts
 
 6
 The following facts are undisputed. Treena Muller was born in Thailand in 1977 and lived in an orphanage until the age of four, when she was adopted by plaintiffs-appellees Henry and Catherine Muller (the "Mullers"). At that time, Treena had virtually no verbal abilities and could speak neither English nor Thai. Treena entered the East Islip School District in kindergarten, but immediately experienced difficulties in school. She was classified as "speech impaired" by the District after having had to repeat the first grade, and received special education services into the fourth grade, when she was declassified. She received remedial reading services through the seventh grade. Despite failing multiple subjects in the seventh and eighth grades, Treena was never held back and advanced to the ninth grade on schedule. Although her grades began to improve during the first quarter of ninth grade, she began to exhibit behavior problems, such as poor attendance in school, cutting classes, failing to complete assignments, staying out late at night, and generally disobeying her parents.
 
 
 7
 On January 10, 1993, following a fight with her parents, Treena attempted suicide by ingesting between 10 and 40 aspirins. After being hospitalized for three days, she returned to school but continued to perform poorly. On February 3, 1993, Treena's parents decided to admit her to South Oaks Hospital ("South Oaks"), a private psychiatric treatment facility, for examination. Upon admission, Dr. Vera Liang conducted the initial psychiatric examination of Treena. Her report noted Treena's history of depression and behavioral problems, and her provisional diagnosis was "Conduct Disorder, Undifferent[iated]" and "Depression [Not Otherwise Specified]."
 
 
 8
 Treena remained at South Oaks for 25 days. Upon discharge, she was referred to an aftercare day treatment program to further address her "anger, depression, impulse control and family problems." She remained in the day treatment program for another three weeks before returning to East Islip High School on March 19, 1993.
 
 
 9
 Treena's emotional and behavioral problems continued, however, and on April 5, 1993, she was readmitted to South Oaks. Treena was again diagnosed as having a conduct disorder, and the examining doctor noted her continued "dysphoric" mood. Her treatment plan indicated the probable need for continued residential treatment following her stay at South Oaks. Dr. Mark Golden, a consultant at South Oaks who treated Treena and was involved in her discharge plan, testified at a 1994 administrative hearing that Treena's emotional and behavioral problems extended back several years. He further testified that, in his opinion, Treena should be placed in a residential treatment center or she would likely resume her pattern of harmful behavior. After several more weeks at South Oaks, Treena was discharged and on April 30, 1993 she was referred to the Wellspring Foundation ("Wellspring"), a private residential treatment and educational facility in Connecticut primarily for individuals with serious psychological problems.
 
 
 10
 Dr. Jeffrey Wold, the Director of Psychiatric Services at Wellspring, diagnosed Treena's condition as a "conduct disorder." Seven months later, he prepared a psychiatric evaluation that specified a "current diagnosis" of "Oppositional Defiant Disorder--in remission" and "Post Traumatic Stress Disorder--delayed and related to childhood deprivation/ adoption." Treena's Wellspring records are also replete with references to her continued depression, and attending to her depression is repeatedly identified as one of Treena's treatment goals.
 
 
 11
 The professionals at Wellspring observed that Treena responded well, both emotionally and academically, to the small, highly structured environment at Wellspring and recommended that, for the future, Treena remain in small group settings in which she could receive much needed emotional support and individualized attention. Indeed, they cautioned that Treena was likely to relapse if she were readmitted to the public school system.
 
 
 12
 In early November, 1993, while Treena was still at Wellspring, the Mullers contacted East Islip's Director of Special Education, Patricia Cuccia, inquiring whether the District would begin paying for Treena's private schooling at Wellspring when the Mullers' insurance coverage ran out. Ms. Cuccia informed the Mullers that a referral to the East Islip Committee on Special Education (the "CSE") was required first, and the proper referral was made on November 8, 1993. As part of the referral process, Treena was required to undergo further educational and psychological evaluations administered by professionals employed by the District.
 
 
 13
 Dr. Phyllis Cooperman, a psychologist for the District, conducted the psychological evaluation. In her report, she concluded that, although Treena exhibited a "tendency for depression" and had difficulty dealing with emotional stress and conflict with her parents due to poor verbal skills, at that time there was "no indication of a depressive condition which would adversely affect her ability to learn." Tom Barry, the District employee who conducted Treena's educational evaluation, concluded in his report that "[a]lthough Treena's scores reveal a low average performance level, they do not indicate the need for Special Education placement."
 
 
 14
 On January 5, 1994, following Treena's evaluations by the District, the CSE held a meeting to consider whether Treena was in need of special education services. This initial meeting was adjourned because additional information on Treena's prior history was needed. The CSE reconvened on January 28, 1994, at which time it considered Treena's educational and psychological evaluations administered by the District, the admission and treatment documentation from Treena's stays at South Oaks and Wellspring, information regarding Treena's academic progress, and a January 27, 1994 psychiatric evaluation of Treena performed by Dr. Wold. In this evaluation, Dr. Wold indicated a current diagnosis of oppositional defiant disorder in remission and post traumatic stress disorder, but stated that Treena's admission diagnosis had been "Oppositional Defiant Disorder with Depression." Dr. Wold also noted in the report that Treena had made "major improvement in treatment" while in the private facilities.
 
 
 15
 At the conclusion of the January 28, 1994 meeting, the CSE was ready to vote on whether Treena needed special education services. Before the CSE could vote, however, the Mullers' advocate, Merrilee Shannon, requested a second adjournment so that she could gather more documentation from South Oaks and Wellspring concerning Treena's condition. The CSE reconvened on February 23, 1994. Ms. Shannon presented an additional psychiatric report by Dr. Wold, dated February 21, 1994, in which he then identified Treena's clinical diagnosis as "Major Depression in an adolescent with diagnosed Learning Disabilities," and noted that post traumatic stress disorder and "the complications of a fragile personality organization" had been "working" diagnoses.
 
 
 16
 At the end of the February 23, 1994 meeting, the CSE concluded that Treena did not meet the eligibility criteria for special education services under the IDEA, but that she might qualify as a student with a disability under Section 504 of the Rehabilitation Act of 1973,[2] and recommended that she be referred to the Section 504 Committee for a determination as to whether she was eligible for services under that Act. Pursuant to the CSE's decision, the Section 504 Committee was convened, and it devised a comprehensive educational plan for Treena. The proposed plan provided for Treena to continue her education at East Islip High School with certain special services. Treena, however, never returned to East Islip High School to avail herself of the services proposed.
 
 
 17
 Instead, in March 1994, the Mullers enrolled Treena in a local special education program run by the Educational Assistance Corporation (the "EAC Program"). The EAC Program was the only private special education program the Mullers could find that would accept Treena without a referral from the District. During the time Treena was in the EAC Program, she showed improvement, both behaviorally and academically.
 
 B. The Proceedings Below
 1. State Administrative Proceedings
 
 18
 a. Before the Impartial Hearing Officer
 
 
 19
 The Mullers, unhappy with the CSE's conclusions and recommendations, appealed to an Impartial Hearing Officer ("IHO").[3] Several of the professionals who treated Treena, including Dr. Golden and Dr. Lynne Albukerk, a psychologist at South Oaks, testified at the hearing that Treena's emotional problems were having a seriously detrimental impact on her education. They testified that Treena exhibited marked academic and social improvement while at South Oaks and Wellspring, and strongly recommended that she continue her secondary education in a private facility where her unique emotional and educational needs could be met. They further testified that aspects of the District's proposed plan would be inappropriate for Treena because returning to East Islip High School would likely cause a setback.
 
 
 20
 After four days of hearings, IHO Charles M. Wetterer made findings of fact and presented the following conclusions in his January 20, 1995 decision: (1) Treena was not a disabled child under New York State regulations, the New York Education Law, and the IDEA; (2) Treena was properly found to have a disability under § 504 of the Rehabilitation Act that required an accommodation plan; (3) the Mullers were not entitled to reimbursement for their costs in educating Treena in a unilateral, private placement; and (4) the Mullers could continue to have Treena educated at a private institution of their choosing at their own expense, or enroll her in an appropriate program in the East Islip Public School District. Essentially, the IHO concluded that Treena's problems stemmed from "family issues" and that there was an insufficient nexus between those problems, as manifested in her "conduct disorder," and her educational performance to entitle her to special education services under the IDEA.
 
 
 21
 b. Before the State Review Officer
 
 
 22
 The Mullers next appealed to the New York State Department of Education, seeking review by a State Review Officer ("SRO"). In a decision rendered April 12, 1995, SRO Robert G. Bentley found that (1) the record did not establish that Treena suffered from a generally pervasive mood of unhappiness or depression; (2) there was no evidence that Treena had an inability to build or maintain satisfactory interpersonal relationships with peers and teachers; and (3) there was no evidence that Treena exhibited inappropriate types of behavior or feelings under normal circumstances while in school. The SRO dismissed the Mullers' appeal, concluding as follows: "[T]here is no evidence that the child requires special education and/or related services to benefit from instruction. Therefore, I ... find that the CSE correctly determined that the child would not be appropriately classified as emotionally disturbed."
 
 2. The District Court's Decision
 
 23
 The Mullers then brought suit in federal district court, pursuant to 20 U.S.C. § 1415(e)(2). This provision permits an aggrieved party in an IDEA case to seek review of the decision of a state or local educational agency in federal district court.[4] After reviewing the full administrative record, the district court vacated the findings and conclusions reached in the state administrative proceedings. Drawing its own conclusions of law based on the administrative record submitted by the parties, the district court found that Treena's emotional and behavioral problems adversely affected her academic performance, and held that Treena qualified under the IDEA as "emotionally disturbed" as defined by the relevant state and federal regulations. By decision dated July 27, 1996, the district court ordered the District to classify Treena as a student with an emotional disability, compensate the Mullers for their expenses in connection with placing Treena in private educational institutions, and pay the Mullers' attorneys' fees and costs incurred in bringing this action.
 
 DISCUSSION
 A. Standards of Review
 
 24
 Section 1415(e)(2) of the IDEA provides that:
 
 
 25
 the [district] court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.
 
 
 26
 20 U.S.C. § 1415(e)(2). In interpreting § 1415(e)(2), the Supreme Court has held that, in reviewing whether a proposed program is appropriate, the district court's inquiry generally should focus on two issues: (1) whether the State has complied with the procedures set forth in the IDEA, and (2) whether the particular individualized education program (the "IEP") developed through the IDEA's procedures was "reasonably calculated to enable the child to receive educational benefits." Board of Educ. v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).
 
 
 27
 The role of the reviewing court in making these assessments is circumscribed. The district courts are required to give "due weight" to the findings of a state administrative proceeding, and the "preponderance" review provision set forth in § 1415(e)(2) "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Id. at 206, 102 S.Ct. 3034. Requiring the federal courts to defer to the findings of the state administrative proceedings ensures that the federal courts do not "impos[e] their view of preferable educational methods upon the States." Id. at 207, 102 S.Ct. 3034.
 
 
 28
 This Court has acknowledged that "Rowley requires that federal courts defer to the final decision of the state authorities." Karl v. Board of Educ., 736 F.2d 873, 877 (2d Cir.1984); see, e.g., Briggs v. Board of Educ., 882 F.2d 688, 693 (2d Cir.1989); Karl, 736 F.2d at 876-77. As we have noted, "[d]eference is owed to state and local agencies having expertise in the formulation of educational programs for the handicapped." Briggs, 882 F.2d at 693. Indeed, we have cautioned that in reviewing state administrative determinations under the IDEA the federal courts must be careful not to "impose a particular substantive educational standard on the state." Karl, 736 F.2d at 876; see, e.g., id. at 877 (reversing district court because it "substituted [its] view that a nine-to-one [student-teacher] ratio was preferable to the twelve-to-one ratio selected by the commissioner" for mentally retarded student); Briggs, 882 F.2d at 693 (concluding that "the district court erred in substituting its judgment for that of the agency experts and the hearing officer" in finding that hearing-impaired child would benefit more from a segregated program than from mainstreaming).
 
 
 29
 Here, however, the district court was not faced with the typical question raised in cases brought under the IDEA, that is, whether the particular IEP adopted by the school district for the student satisfied the IDEA's requirement that the disabled child receive a "free appropriate public education." See 20 U.S.C. § 1400(c). Rather, the issue before the district court was whether the school district properly classified Treena as an individual with or without a disability in the first instance. Treena was not provided with an IEP pursuant to the IDEA because the CSE determined that she was not disabled as that term is defined under the IDEA. The dispute, therefore, is not whether the CSE developed an IEP for Treena that was "reasonably calculated to enable [her] to receive educational benefits," Rowley, 458 U.S. at 207, 102 S.Ct. 3034 but rather, whether she satisfied the definition of "emotionally disturbed" set forth in the relevant state and federal regulations.
 
 
 30
 Resolution of this issue involves interpretation of the IDEA and the definition of "emotional disturbance" under the applicable federal and New York State regulations. In this matter of statutory interpretation, the district court was as well-positioned as the state administrative officials to determine Treena's eligibility. As the underlying facts of this case as to Treena's behavior and performance were not in dispute, but only the legal conclusions to be drawn from those facts, the state administrative officials were in no better position than the district court to make conclusions with respect to Treena's statutory eligibility based on the record. See Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1122 (2d Cir.1997) (reasoning that the "due weight" that ordinarily must be given to the state administrative proceedings is not implicated where the decision below concerns an issue of law); cf. Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1376 n. 9 (8th Cir.1996) ("While school authorities are better situated than courts to determine what educational practices and materials to include in a child's IEP, they may not choose to exclude qualified children from receiving IDEA services."). Accordingly, the district court was not bound by the Rowley rule of deference and was free to consider the issue of Treena's statutory eligibility de novo.
 
 
 31
 Ordinarily, we review the factual findings of the district courts under the "clearly erroneous" standard, see Fed.R.Civ.P. 52(a), and review their legal conclusions de novo. Here, however, we are presented with a mixed question of law and fact--the application of the IDEA's statutory and regulatory definitions to the particular facts of Treena's medical and educational history. Accordingly, our review of the district court's conclusions is de novo. Cf. American Geophysical Union v. Texaco Inc., 60 F.3d 913, 918 (2d Cir.1994) (de novo review of mixed question of copyright "fair use"), cert. dismissed, 516 U.S. 1005, 116 S.Ct. 592, 133 L.Ed.2d 486 (1995); United States v. McCombs, 30 F.3d 310, 317 (2d Cir.1994) (plenary review of trial court's "application of a legal standard to facts undisputed" in taxpayer liability determination).
 
 
 32
 B. Treena's Entitlement to Educational Services Under the IDEA
 
 1. Legal Standards
 
 33
 Congress passed the IDEA to "assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, [and] to assure that the rights of children with disabilities and their parents or guardians are protected." 20 U.S.C. § 1400(c). The term "children with disabilities" includes children with various physical impairments as well as children with a "serious emotional disturbance." Id. § 1401(a)(1)(A)(i). Whether a student has a serious emotional disturbance is determined by the individual school district in accordance with state law. Pursuant to New York State regulations, an emotionally disturbed student is defined as:
 
 
 34
 A student with an inability to learn which cannot be explained by intellectual, sensory or health factors and who exhibits one or more of the following characteristics over a long period of time and to a marked degree:
 
 
 35
 (i) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
 
 
 36
 (ii) inappropriate types of behavior or feelings under normal circumstances;
 
 
 37
 (iii) a generally pervasive mood of unhappiness or depression; or
 
 
 38
 (iv) a tendency to develop physical symptoms or fears associated with personal or school problems.
 
 
 39
 The term does not include socially maladjusted students unless it is determined that they are emotionally disturbed.
 
 
 40
 N.Y. Comp.Codes R. & Regs. tit. 8, § 200.1(mm)(4) (1996).[5]
 
 
 41
 The IHO and the SRO both concluded that Treena would not be appropriately classified as having a "serious emotional disturbance." The district court disagreed. Our task, therefore, is to determine whether, reviewing the district court's conclusions de novo, Treena should have been classified as an emotionally disturbed child under the applicable New York State regulations.
 
 2. Analysis
 
 42
 The District argues that the SRO's finding that Treena did not satisfy the definition of emotional disturbance was amply supported by the administrative record. It contends that Treena suffered from a mere "conduct disorder," and asserts that students who are socially maladjusted are specifically excluded from the definition of emotionally disturbed, see N.Y. Comp.Codes R. & Regs. tit. 8, § 200.1(mm)(4), and that students with conduct disorders are not entitled to special education services under the IDEA, citing Doe v. Board of Educ., 753 F.Supp. 65, 70-71 (D.Conn.1990). The District further argues that the district court failed to give the determinations of the state administrative officers the due deference required by Rowley, and therefore erred in concluding that Treena is entitled to special education services pursuant to the IDEA. Rather, the District maintains, the district court should have affirmed the SRO's findings. We disagree.
 
 
 43
 In our view, the district court correctly concluded that Treena suffered from a "serious emotional disturbance" within the meaning of the relevant state and federal regulations, and we reject the District's arguments to the contrary. To qualify as having a "serious emotional disturbance" under the New York State regulations, a child must (1) demonstrate an inability to learn, and (2) exhibit at least one of the four enumerated characteristics over a long period of time and to a marked degree. Here, the record establishes that Treena demonstrated an inability to learn and exhibited two of the four enumerated characteristics over a long period of time and to a marked degree.
 
 
 44
 First, the record clearly establishes that Treena displayed an inability to learn that was not explained solely by intellectual, sensory, or health factors. See N.Y. Comp.Codes R. & Regs. tit. 8, § 200.1(mm)(4). She was required to repeat the first grade, was classified as speech and language impaired thereafter, received special education services through the fourth grade, received remedial reading services through the seventh grade, and failed multiple subjects in the seventh and eighth grades. Psychologists who examined her testified that her emotional difficulties adversely affected her educational development. This testimony, together with evidence that Treena's academic performance improved in settings in which her emotional problems were being addressed clinically, adequately supports the conclusion that Treena had an inability to learn (as reflected in her poor academic record at East Islip High School) that stemmed at least in part from her emotional problems, rather than only from her early childhood speech disability or her borderline-range intellectual abilities.[6]
 
 
 45
 Second, the record also demonstrates that Treena exhibited two of the four characteristics enumerated in the definition of emotional disturbance over a long period of time and to a marked degree. To begin with, the evidence showed that Treena exhibited the third of the four characteristics, a "generally pervasive mood of unhappiness or depression," and that she did so for a long period of time and to a marked degree. See N.Y. Comp.Codes R. & Regs. tit. 8, § 200.1(mm)(4)(iii). While Treena was never formally diagnosed with clinical depression, the regulation does not require that the student be clinically or medically depressed but only that she exhibit a "generally pervasive mood of unhappiness or depression." Treena displayed signs not only of unhappiness and depression but of despondency, as evidenced by her suicide attempt. Moreover, nearly every doctor and psychologist who examined Treena noted in his or her report that Treena exhibited symptoms of depression, and her treatment reports from South Oaks and Wellspring unequivocally demonstrate that Treena was treated for depression.
 
 
 46
 The record also demonstrates that Treena exhibited the second of the four characteristics, "inappropriate types of behavior or feelings under normal circumstances," for a long period of time and to a marked degree. See N.Y. Comp.Codes R. & Regs. tit. 8, § 200.1(mm)(4)(ii). The district court found numerous examples of Treena's inappropriate behavior, such as "suicide attempts, ... arson attempts, ... lies, cutting classes, failure to complete homework, stealing things, quitting the basketball team, ... defiance, poor grades and academic performance." Many of these behaviors, of course, are not unusual or "inappropriate" by themselves. In combination, however, they provide more than an adequate basis for the district court's conclusion that Treena exhibited "inappropriate types of behavior or feelings under normal circumstances." Moreover, this behavior spanned a period of several years and existed to a marked degree.
 
 
 47
 The district court correctly concluded, from the record before it, that Treena's problems amounted to more than a mere conduct disorder. Accordingly, we affirm the district court's determination that Treena suffered from a "serious emotional disturbance" within the meaning of N.Y. Comp.Codes R. & Regs. tit. 8, § 200.1(mm)(4) and uphold its reversal of the state administrative finding to the contrary.
 
 
 48
 C. The Mullers' Entitlement to Reimbursement Under the IDEA
 
 
 49
 The next issue is whether the district court properly held that the Mullers were entitled to reimbursement from the District for the expense of privately placing Treena in the EAC Program after the District determined in February of 1994 that Treena was not eligible for special education services under the IDEA.[7]
 
 
 50
 The IDEA broadly authorizes a district court to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). In School Committee of the Town of Burlington, Massachusetts v. Department of Education, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the Supreme Court held that this provision includes the power to order school authorities to reimburse parents for their expenditures on private special education for a child, if the court determines that such placement, rather than the school district's proposed IEP, is proper. Id. at 369, 105 S.Ct. 1996. The Court held that the district court should consider two factors in determining whether a public school district is required to reimburse the child's parents: (1) whether the school district's placement pursuant to its IEP is inappropriate, and (2) whether the private placement desired by the parents is appropriate. Id. at 370, 105 S.Ct. 1996. As to the latter inquiry, the parents need not have placed their child in a school that is specifically approved by the local school authorities. See Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 13-14, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).
 
 
 51
 Considering the first prong of the Burlington test,[8] the District's proposed accommodation plan under § 504 of the Rehabilitation Act cannot be considered appropriate in light of Treena's needs. The district court properly concluded that she was entitled to benefits under the IDEA. Hence, the District should have devised an IEP to meet Treena's unique needs in compliance with the provisions of the IDEA, and its proposed plan under § 504 of the Rehabilitation Act was not an adequate substitute. See Yankton, 93 F.3d at 1376 (where individual is eligible under both the IDEA and § 504, "the school district is not free to choose which statute it prefers").[9] Both Dr. Golden and Dr. Albukerk testified at the state administrative hearing that Treena's emotional health and academic performance would suffer were she to return to the public school system. They further testified that several aspects of the District's proposed § 504 plan would likely cause Treena to suffer a relapse and revert back to her destructive behavior.
 
 
 52
 The Mullers' placements, on the other hand, were entirely appropriate under the circumstances. The District contends that the record is bereft of evidence to support a determination that the Mullers' unilateral, private placements were appropriate for Treena. Specifically, they argue that the Mullers' decision to place Treena in private facilities cannot be deemed appropriate because such placements were not the least restrictive alternatives for Treena. To the extent that the District contests the Mullers' placement of Treena at Wellspring, the argument is misplaced, for the Mullers are not seeking reimbursement for Treena's residential placement, only for her enrollment at the EAC Program.
 
 
 53
 As for the Mullers' placement of Treena in the EAC Program, a nonresidential private facility, while we recognize that there is a "strong statutory preference in favor of 'mainstreaming,' " Phillips v. Board of Educ., 949 F.Supp. 1108, 1114 (S.D.N.Y.1997), "we are mindful that the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." Briggs, 882 F.2d at 692. Here, it is clear that mainstreaming did not work for Treena. The record demonstrates that Treena did not and could not succeed in the public school system and that her behavior and academic performance improved considerably once she was removed from the public school setting. While the EAC Program was in fact a more restrictive environment than East Islip High School, the District failed to provide Treena with an appropriate IEP under the IDEA that would allow her to continue her public school education, and, thus, the Mullers had no alternative but to unilaterally place her in a private facility. We conclude that the Mullers' placement of Treena in the EAC Program, after the District erroneously determined that she was ineligible for benefits under the IDEA, was appropriate, see Burlington, 471 U.S. at 370, 105 S.Ct. 1996 and "reasonably calculated to enable [her] to receive educational benefits." Rowley, 458 U.S. at 207, 102 S.Ct. 3034.
 
 
 54
 Finally, we note that our decision merely requires the District "to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP" for Treena. Burlington, 471 U.S. at 370-71, 105 S.Ct. 1996. Accordingly, we hold that the district court properly ordered the District to compensate the Mullers for their out-of-pocket expenses in enrolling Treena in the EAC Program.
 
 CONCLUSION
 
 55
 For the reasons set forth above, the judgment of the district court is affirmed in all respects.
 
 
 
 *
 The Honorable Denny Chin of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Prior to 1990, the statute was known as the Education of the Handicapped Act. The Act was renamed the Individuals with Disabilities Education Act ("IDEA") in 1990. The IDEA was amended as of June 4, 1997, and these amendments reorganized many of the substantive provisions of the Act. To avoid confusion, we refer to the provisions of the IDEA that were in effect during the time period relevant to this action
 
 
 [2]
 29 U.S.C. § 794 (Supp.1994). The purposes of the Rehabilitation Act are similar to that of the IDEA, but the Rehabilitation Act is broader in scope. This statute provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Id. § 794(a). The definition of "individual with a disability" under § 504 of the Rehabilitation Act is broader in certain respects than the definition of a "child with [a] disabilit[y]" under the IDEA. Compare 29 U.S.C. § 706(8)(B) with 20 U.S.C. § 1401(a)(1)(A). For example, § 504's reach extends not only to individuals who in fact have a disability, but also to individuals who are regarded as having such a disability (whether or not that perception is correct). See 29 U.S.C. § 706(8)(B)(iii)
 
 
 [3]
 Pursuant to IDEA § 1415(b)(2), all parents are entitled to appeal an adverse decision at an "impartial due process hearing" before the relevant local or state educational agency
 
 
 [4]
 The statute provides that the district court's review may concern "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(1)(E)
 
 
 [5]
 The federal regulation defining "serious emotional disturbance" is almost identical to the New York state regulation. The only difference is that the federal regulation does not require that the student exhibit "an inability to learn" in addition to one of the four characteristics. Rather, "an inability to learn" is an alternative characteristic that satisfies the definition of "serious emotional disturbance." See 34 C.F.R. § 300.7(b)(9) (1997). Inasmuch as the district court found, and we agree, that Treena suffered from an inability to learn as a result of her emotional difficulties as well as from other characteristics listed in the regulations, this difference between the federal and state regulations is of no concern here
 
 
 [6]
 The IHO's apparent belief that Treena's emotional problems were unrelated to school is of little if any relevance, so long as those problems had a significant effect on her ability to learn. Mrs. B. v. Milford Bd. of Educ., 103 F.3d at 1122 ("The fact that a residential placement may be required to alter a child's regressive behavior at home as well as within the classroom ... does not relieve the state of its obligation to pay for the program under federal law so long as it is necessary to insure that the child can be properly educated.")
 
 
 [7]
 The Mullers seek tuition reimbursement only for the expense of sending Treena to the EAC Program. In fact, the parties entered a stipulation, dated November 14, 1996, by which they agreed upon the amount due the Mullers in the event the District is required to reimburse them
 
 
 [8]
 The District points out that the district court's order to compensate the Mullers was not the result of an express Burlington analysis; indeed, the district court did not cite Burlington, and its only reference to compensation came in the final sentence of the opinion--the order itself. That omission was harmless in this particular case, however, inasmuch as the district court's conclusion was consistent with the requirements of Burlington. Nonetheless, the Burlington analysis should have been applied
 
 
 [9]
 Although the provision of an IEP under the IDEA will sometimes satisfy a district's § 504 obligations, see 34 C.F.R. § 104.33(b)(2), the converse is not generally true. See Smith v. Robinson, 468 U.S. 992, 1019-20, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)